## STEDMAN ET AL. *v.* BOONE.

PRINCIPAL AND SURETY.—*Fairness to Surety.*—*Duty of Surety.*—As a rule of law, strict integrity and complete fairness are due from the creditors of a debtor to one who is about to become surety for such debtor; but this rule will not excuse the person about to become surety from reasonable attention to the circumstances under which he is called upon and reasonable diligence to inform himself as to the prudence of the act he is about to do.

SAME.—If a person who is asked to become surety for another is put upon his guard by the circumstances surrounding the party for whom he is asked to become surety, and can ascertain from the persons present all the facts necessary to shield himself from fraud, he should make the inquiry.

SAME.—Fraud must not be induced by the person who complains of it, nor must he suffer himself to become an indolent victim.

SAME.—*Right of Surety to Rescind for Fraud.*—If a person is induced by fraud to become the surety of a debtor, and by the act he takes the property of the debtor from the reach of his creditors by ordinary process of law, he must, upon the discovery of the fraud, at once rescind, if he would relieve himself.

PAYMENT.—*Voluntary Payment.*—Money voluntarily paid, with a full knowledge of the facts, cannot be recovered back.

From the Clinton Circuit Court.

*J. W. Nichol, L. Jordan, L. McClurg,* and *J. E. McDonald,* for appellants.

*T. A. Hendricks, O. B. Hord, A. W. Hendricks,* and *A. J. Boone,* for appellee.

BIDDLE, J.—Complaint by the appellants against William Shannon, Elisha D. Shannon, and the appellee, on the following bond:

" This agreement, made and entered into by and between William Shannon, Elisha D. Shannon, and Andrew J. Boone, of the one part, and Stedman & Shaw, Murphy, Kennedy & Co., Webb, Tarkington & Co., Evans, Dawes & Co., Pearce, Tolle & Halton, C. E. Hawthorne, Talbott & Son, and E. G. Leonard, of the second part, witnesseth, that, whereas the said William Shannon is indebted to the said several parties of the second part as follows :" setting forth the debts, amounting to five thousand and seventy-six dollars and eight cents. " And to secure the payment of the said several sums of money and accruing interest to the said parties of the second part, the said Shannon has this day transferred to James N. Binford, of Thorntown, Boone county, Indiana, as trustee, certain property described in a schedule marked 'A,' to be by him reduced to money and applied to the payment of said claims *pro rata*, as the avails of said property shall come into his hands. Now, therefore, if the said Binford from the said property shall pay the said claims and all accruing interest in full within eighteen months from this date, then.the parties of the first part shall be fully discharged from this obligation ; but, in case the said Binford shall fail, from the proceeds of said property, to pay the said claims as aforesaid, in manner aforesaid, then, in consideration of the premises, the said parties of the first part bind themselves to pay the parties of the second part any deficiency. Any surplus that may remain in the hands of said Binford, after the payment in full of the parties of the second part, as aforesaid, and all expenses of reducing said property to money and paying over the same, shall be returned to said Shannon.

" In witness whereof," etc.

This bond is dated the 27th of September, 1865, and signed by the two Shannons, the appellee, and the appellants.

Neither of the Shannons was served with process, nor did either of them appear. Boone answered :

1. That he believed William Shannon to be an honest and trustworthy man, possessing ample means to pay his debts ; that, as an inducement to him to execute said bond, the appel—

lants represented to him that the assets set out in said schedule were of great value, to wit, seven thousand seven hundred and ninety dollars and twenty-three cents, and procured said Shannon to assent to said statement; that reposing implicit confidence in the truth of these representations, and in the solvency of William Shannon, and being wholly ignorant of the facts hereinafter stated, he executed the bond; that said Shannon was about to remove out of the State, taking with him property subject to execution; that the plaintiffs instituted proceedings in the court of common pleas of said county, and had the said William Shannon and Elisha D. Shannon arrested; that orders of arrest were procured on affidavit; that the Shannons were under arrest and in the custody of the sheriff at the time said appellee signed the said bond; that at the time he did so execute said bond, the property specified in said schedule was only of the value of twelve hundred dollars; that all of said facts were known to appellants and unknown to the appellee, which knowledge they withheld from him for the fraudulent purpose of inducing said appellee to execute said bond; all of which is formally alleged, with time and dates, and with exhibits filed.

2. The second paragraph of answer is similar to the first, with the additional averments, that Binford, the trustee named in the bond, had entered upon his trust and reduced certain of the assets—setting them forth—to money, amounting to one thousand and forty-five dollars and thirty-six cents, which was all that Binford could collect from the personal property; that, in pursuance of an agreement, Binford, on the 20th day of September, received conveyances for the real estate mentioned in the trust, for the purposes specified in the bond; that on the 10th of March, 1871, he received information of William Shannon's insolvency, and Binford then conveyed the said lands and the residue of said property in trust, consisting of small accounts, to appellee, who was to make such disposition of said personal property and lands as should seem best; that on the 21st of May, 1867, appellee procured a deed of conveyance from William Shannon of one hundred

and sixty acres of land in Ringgold county, Iowa—describing the same—in trust for said creditors; that the title to said lands was encumbered, defective, and worthless; that said appellee had received in money from said assigned property one hundred and fifty dollars and fifty-nine cents, and paid to the creditors, stating the particulars, in all amounting to two thousand one hundred and fifteen dollars and sixty cents, expending for services and expenses two hundred dollars; that all this was without any knowledge of the fraud, crime, and deceit of the plaintiffs as alleged, until about March 5th, 1869; then there is an offer to reconvey the lands, and a prayer for relief, all of which is formally stated, with dates, exhibits, etc.

3. The third answer was payment.

Demurrers were filed, and properly overruled, to the first and second paragraphs of answer.

Replies were filed to the first and second paragraphs, and issue joined.

Trial by jury. General verdict for the appellee against the appellants; against George T. Stedman and Thomas F. Shaw, for one thousand and sixty-eight dollars and thirty-two cents; against John W. Murphy, B. Frank Kennedy, Wiley W. Johnson, and William Holliday, for four hundred and twenty-five dollars and seventy cents; against Willis S. Webb, William C. Tarkington, and Frank Landers, for four hundred and twenty-one dollars and thirty-three cents; against William N. Evans, Adelbert C. Dawes, John Picken, Nathan T. Parker, and Ellison C. Hill, for sixty dollars and fifty-seven cents; against John M. Talbott and Charles M. Talbott, for forty-five dollars and twenty-five cents.

There was no finding by the jury in reference to the lands offered to be reconveyed by the third paragraph.

Motion for a new trial overruled. Judgment against the appellants in favor of the appellee for the several amounts as found by the verdict, and for the reconveyance of the lands to a trustee for the benefit of the creditors. Appeal to this court.

The evidence is all before us, in a bill of exceptions, and the third error assigned is, that it is insufficient to sustain the verdict.

Andrew J. Boone, the appellee, testifies: "When I came to town on the morning of the 27th of September, 1865, after leaving my horse at the livery stable, I went immediately to the court-house, and, as the court had commenced, went at once to business in the court; in a short time some one came to me, I cannot say whether it was the sheriff or a bailiff of the court, and informed me that some gentleman desired to see me in the room in the south-east corner of the court-house, up stairs; think it was used by some one as a law office at the time; asked the messenger what was wanted; he said there were some men there who wanted to see me on business; in a short time I went to the room, and found Joseph E. McDonald, who was sitting there at a table writing, Frank Landers, who was standing, William Shannon, Elisha D. Shannon, John Kenworthy, sheriff, and a man whom I have known as Thomas F. Shaw, who was also standing in the room, and it is possible there were some others, but I do not recollect them; I inquired what was wanted with me; Mr. Shaw replied, that I had been called to go security for William Shannon, who was indebted to various persons, amounting to some five thousand dollars, a statement of which was made, and that certain personal and real property was to be turned over to James N. Binford, as trustee, to be by him converted into money and applied on the indebtedness, *pro rata,* from time to time, as set forth in the agreement; Mr. Shaw held up to me a statement of the property to be thus assigned to Binford, on a paper of which schedule ' A,' referred to in the written bond, is a copy, giving the amounts and kinds of property, as follows:" (giving the contents of the schedule attached to the bond); " that if the money could not be made out of these assets in eighteen months, the bond was to secure the deficiency; I then said that I had retired from business, and did not wish to become responsible for so large a sum of money, but if the property was of the value stated, I had no objections to

the use of my name, for the purpose of allowing the reduction
of the assets to money, but did not wish to become reponsible
for the payment of money ; that I knew nothing of the value
of the property, but supposed it was all correct.  Shaw
responded, that it was so represented to him, and the Shan--
nons nodded assent ; I cannot state whether this was all said
when I first came into the room, or whether a part then and
part when I came a second time to sign the bond ; Mr. Mc-
Donald then had a draft of the bond completed, or about so,
and read it over to me ; there was so much scratching and
interlineation that it was decided the original draft should be
copied, which Mr. Shaw proposed to do, and did do ; he wrote
two or three copies, two at least of which I signed ; while the
copies were being made I returned to the court room to busi--
ness again, and was called again to sign the bond ; think all
the parties except myself remained in the room ; Mr. Shaw
represented all the creditors except Webb, Tarkington & Co.;
I then returned to business."

In a letter addressed to Stedman & Shaw, Cincinnati, Ohio,
dated March 11th, 1867, Mr. Boone writes :

" I called upon Mr. Binford at Thorntown, and with him
made an examination of the Shannon assets, of the notes and
accounts, and find uncollected     -     -     -     $642.46
Collected  and applied on your  claims, taxes, and
expenses     -     -     -     -     -     -     -     846.12

Total of notes and accounts     -     -     -     $1,488.58
The uncollected are perfectly worthless for the purpose of rais-
ing money.     *     *     *

" The farm in Iowa the Shannons have sold, and after pay--
ing off the mortgage of thirteen hundred dollars, have used
the residue of the money.  This farm they represented as
worth three thousand dollars, and free at the time I signed
the bond, and promised then to make to me a mortgage on it
to secure me against contingencies.  Their representations to
me were, at the signing of the bond, that the assigned property

was worth seven or eight thousand dollars ; that it would make money enough and more than to pay creditors."    *    *

" Thus you see, I am victimized. I have some money which I intend to apply to the claims of the Shannon creditors *pro rata,* and have property and claims, but have not money enough to pay the creditors off, and cannot convert my property to money without ruinous sacrifices to me.    *    *

" I have no acquaintance with you, but from your business and position I am warranted in presuming you a gentleman. My folly in becoming surety should not be a pretext for a severer punishment than the payment of the debt on the easiest terms. If I had received your goods or your money to the amount of your claims, I would not complain of the last dollar and the last cent ; nor do I complain of any act of yours now ; but it will be easier for me to pay without costs than with them, so that I have recourse upon the Shannons.    *

* If you allow commissions, allow them to me. I am more interested in making your claim for you than any one I know of.    *    *

" I desire to meet as many of the creditors as I can at Indianapolis, on Tuesday, 19th inst. next, at 10 o'clock A. M., at the office of McDonald & Roach, or at any other convenient place. I will have a little money to distribute among them, and want to make some arrangements for an attack upon my principals."

In a letter from Boone to the same parties, dated March 21st, 1867, he says :

" I purchased the Shannon assets yesterday for six hundred dollars, and regard it as an exceedingly poor investment at that. Mr. Binford makes the entire receipts on assets to the 20th inst.  -  -  -  -  -  -   $1,016.92

And sales of lands on 20th and accounts  -  -    600.00

$1,616.92"

Joseph E. McDonald testified as follows :

" On the morning of the day the bond was given, I was spoken to by Mr. Landers to assist Col. Hamilton and

·Galvin in the settlement. Shaw also spoke to me. I learned the Shannons had been arrested on *capias*, but I gave no attention to that part of the business. Binford was acting as attorney for the Shannons. Binford told me he would ask the creditors for a settlement. That was the first I knew of the offering of the assets. My best recollection is, that shortly after the court convened in the afternoon, the Shannons were proposing to make another offer. I was called into the room where the business was transacted; I went in there, and found Mr. Shannon and his son; and Mr. Binford, Mr. Shaw, and Mr. Landers were there, and probably went there with me. In the conversation, the Shannons thought it was hard that the creditors refused the assets. They then talked of time. Mr. Shaw carried on the conversation, and said they could have any reasonable time, and if the claims were made out of the assets, well and good, but if not, the balance must be secured; the Shannons could appoint their own attorney to attend to the business, but the deficiency must be secured. The creditors said they could have time, if it was proposed to turn the assets into money, but there must be security. The Shannons finally agreed to make the offer of surety, and one or the other of the Shannons suggested Boone. Shaw and Landers asked about Boone's condition. I said it was good; that he was responsible. Mr. Boone had not been before named. Shaw and Landers, acting for the creditors, agreed to give eighteen months to turn the assets into money, and consented to have Binford appointed as trustee for that purpose, and agreed to receive Boone as surety. The Shannons, Shaw, Landers, and the sheriff were present. The sheriff or his deputy went for Mr. Boone; when Mr. Boone came in, my recollection is, I stated the proposed negotiation. The proposal was to make Mr. Binford trustee and turn the assets into money, and for Boone to become surety for the deficiency after the assets were exhausted, if there was any deficiency. I don't remember to have seen the schedule; it was referred to, but I don't remember of seeing it. The statement was, that the creditors were willing to give time, and allow the Shannons to make Binford trustee;

they simply wanted surety; if the money could not be made out of the assets, it was to be made out of the surety. I did not draw up the bond till Mr. Boone had consented to become surety. Boone went out, and I had almost finished the bond when Mr. Boone was called in. There were several interlineations in the draft I made, and I proposed to Mr. Shaw to make a copy. I dictated to him while he wrote; when he had finished the copy, I tore up the original draft. The schedule was referred to, and the fact was stated that the Shannons proposed to turn over the assets to Binford as trustee. I heard neither Shaw nor Landers make any representations as to the value of the assets; the creditors did not want the assets, and said so; they were unwilling to settle in that way, unless they were made secure. Boone's name was suggested by one of the Shannons; I think they had Boone sent for by the sheriff."

Thomas F. Shaw, as to the time and place where the bond was executed, testified as follows:

"I saw the schedule in the room; I made no representations to any one about the value of the assets; I made no representations to any one. * * I had some talk with Mr. Boone at the time the creditors met, March 19th, 1867, at Murphy & Johnson's store, about the surety, and he then made no complaint about the creditors; he was mad at the Shannons, but not at the creditors."

On cross-examination, Shaw states: "I made no representations as to the value of the securities, for I knew nothing about their value."

B. Franklin Landers testified: "The next day the parties were under arrest nearly all day, and wandered about town most of the time; toward noon a settlement was proposed; time was asked for, and surety was to be given; the name of Boone was suggested by either one or the other of the Shannons. * * * I never made any representations, at the time the bond was executed, about the solvency of the Shannons or the value of the assets; I believed them to be good, and believed that when they were brought up to the jail door they would shell out; the fact of their arrest was notorious, and

I supposed that Boone knew it as did every one else; there was no concealment of the arrest; they were around town and in custody of the sheriff, and I supposed that that fact was known to Boone."

This is all the essential evidence touching the fraud set up in the first and second paragraphs of the answer, which, it is averred, consisted in the fraudulent representations of the appellants to the appellee, concerning the value of the assets in schedule " A " accompanying the bond, and the fraudulent suppression of the fact that the Shannons had been and were under arrest at the time the bond was executed by the appellee.

There is no evidence in the record showing that any of the appellants made any representations to Boone as to the value of the assets mentioned in the schedule at any time. Boone testifies that just before and about the time he signed the bond, in talking of the value of assets named in the schedule, he Boone said he "supposed it was all correct," to which Shaw responded, that " it was so represented to him (Shaw), and the Shannons nodded assent." But there is no evidence whatever that the assent of the Shannons was thus obtained by collusion with Shaw. Shaw testifies that he made no representations whatever to Boone or any one else about the value of the assets, and that he had no knowledge of their value. McDonald, who was present during all the time of the transaction, testifies that he " heard neither Shaw nor Landers make any representations as to the value of the assets."

The fraud alleged to have been committed at the time the bond was executed is thus left to rest solely upon the fraudulent suppression of the fact that the Shannons were at the time under arrest. Shaw testifies that he said nothing about the arrest at the time, because he supposed Boone knew it. Landers testifies, that " the fact of their (the Shannons') arrest was notorious, and he supposed that Boone knew it, as did every one else. There was no concealment of the arrest. They were around town and in custody of the sheriff, and I supposed that that fact was known to Boone."

Boone testifies, that at the time he executed the bond, he knew nothing of the arrest.

There was much in the circumstances, however, to inform Boone that there was something peculiar in the transaction. The place where it transpired was unusual for such business; the sheriff or his bailiff came for him; he saw the Shannons with the sheriff in the room; their creditors were there, pressing them for some arrangement of their debts; they wanted them to take the assets; the schedule was presented; they would not take them, but insisted upon security; he was applied to to sign their bond. All of these facts are out of the usual way in which merchants settle with their creditors, and should have put Boone on his guard against hastily signing the bond without inquiry or consideration. While strict integrity and complete fairness were, as a rule of law, due from the creditors of Shannon to Boone when he was about to become their surety, yet this did not excuse Boone from reasonable attention to the circumstances and reasonable diligence to inform himself as to the prudence of the act he was about to do. He could have ascertained from the persons in the room all the facts necessary to shield himself from fraud, and, having been put upon his guard by the circumstances, he should have made the inquiry.

Fraud must not be induced by the person who complains of it, nor must he suffer himself to become an indolent victim. Fraud is never presumed. It must be proved by the party who alleges it.

And if fraud was practised upon Boone in obtaining the execution of the bond, as is alleged, it was his duty at once, upon its discovery, to rescind the obligation. His act took the property of William Shannon away from the reach of his creditors by the ordinary process of law, and he cannot, with a full knowledge of the facts, keep it in that condition, though there might have been fraud in procuring the execution of the bond. There is not in the whole range of the evidence, from the execution of the bond to the commencement of the suit upon it, any complaint shown to have been made by Boone against the

creditors of William Shannon.  On the contrary, in his letter to Stedman & Shaw, of March 11th, 1867, nearly a year and a half after the execution of the bond, and after he knew all about the deficiency in the assets, and long after he must have known of the arrest of the Shannons, of which he complains, he speaks of his own " folly in becoming surety," and says, " nor do I complain of any act of yours now ;" seeks an interview with the creditors of Shannon, saying, " I will have a little money to distribute among them, and want to make some arrangements for an attack upon my principals." His letter to the same parties, dated March 21st, 1867, giving a statement of the condition of the assets, is of similar purport. After treating the bond as obligatory from the time it was executed to the commencement of the suit upon it, a period of over three years, thus during all this time keeping the property of William Shannon away from execution by his creditors, and with a full knowledge of all the facts of which he now complains for at least two years, in our opinion it was too late to avail himself of any fraud in obtaining the bond, even though such fraud had been clearly proved.  The authorities are clear upon this point.  In 2 Parsons Con. 780, 781, the author says :

" The defrauded party does not lose his right to rescind because the contract has been partly executed, and the parties cannot be fully restored to their former position ; but he must rescind as soon as circumstances permit, and must not go on with the contract after the discovery of the fraud, so as to increase the injury necessarily caused to the fraudulent party by the rescission.  In other words, if he rescinds on the ground of fraud, he must do so at once on discovering the fraud ; for he is not bound to rescind, and any delay, especially if it be injurious to the other party, would be regarded as a waiver of his right.

" The mere lapse of time, if it be considerable, goes far to establish a waiver of this right ; and if it be connected with an obvious ability on the part of the defrauded person to discover

the fraud at a much earlier period, by the exercise of ordinary care and intelligence, it would be almost conclusive."

In Leake Law of Contracts, a late English work, p. 193, the author on this point lays down the rule as follows:

" Where an agreement has been induced by the fraud of one of the parties upon the other, the party defrauded has the right of avoiding the agreement upon the discovery of the fraud ; but, subject to the exercise of such right, the agreement is binding.   *   *   If a party who has been induced to enter into an agreement by the fraud of the other party, after discovering the fraud, treats the agreement as binding, he loses his right of avoiding it."

The court in *Masson* v. *Bovet*, 1 Denio, 69, hold the following language :

" But if the party defrauded would disaffirm the contract, he must do so at the earliest practicable moment after discovery of the cheat. That is the time to make his election, and it must be done promptly and unreservedly. He must not hesitate ; nor can he be allowed to deal with the subject-matter of the contract and afterwards rescind it."

In *Sieveking* v. *Litzler*, 31 Ind. 13, this court declared that " one of the most clearly established rules in this class of cases is, that the party claiming to rescind on account of fraud must act at once on discovery of the fraud; and he cannot postpone discovery by neglect to use ordinary diligence."

We shall not depart from this well settled rule.   See, also, *Shaw* v. *Barnhart*, 17 Ind. 183, and *Shepherd* v. *Fisher*, 17 Ind. 229.

The evidence shows us that the ground of the appellee's demand, set up in the third paragraph of his answer, is for money paid to the appellants under the obligations of the bond, and we are convinced that the payments were made by the appellee after he had become fully informed of all the facts touching the execution of the bond and the value of the assets described in the schedule ; he cannot, therefore, recover back the money thus paid.   Money voluntarily paid, with a full

knowledge of the facts, cannot be recovered back.   Leake Law of Contracts, 46, 56 ; *Woodburn's Adm'r* v. *Stout,* 28 Ind. 77 ; *Shirts* v. *Irons,* 28 Ind. 458 ; *Bevan* v. *Tomlinson,* 25 Ind. 253 ; *Brooks* v. *Berryhill,* 20 Ind. 97 ; *Jenks* v. *Lima Township,* 17 Ind. 326 ; *The Town of Ligonier* v. *Ackerman,* 46 Ind. 552.

We are of opinion that the evidence does not establish the fraud ; but whatever it may establish on that point, it proves without contradiction that Boone, with a full knowledge of all the facts, recognized the validity of the bond, and afterwards paid money under its terms ; he cannot, therefore, now avoid its obligation, much less recover back the money so paid.

The judgment is reversed, at the appellee's costs; and the cause remanded for further proceedings not inconsistent with this opinion.

Buskirk, J.—I concur in so much of the opinion of the court as holds that the payments made by the appellee were voluntary, and cannot be recovered back, and from the remainder of the opinion I dissent.