Emery *v.* Third National Bank of Pittsburgh,
Appellant.

Argued March 17, 1932. Before FRAZER, C. J., SIMPSON, KEPHART, MAXEY, DREW and LINN, JJ.

*Wm. M. Moorhead,* of *Moorhead & Knox,* with him *Lawrence D. Blair,* for appellant.—It is beyond the authority of officers of a bank to negotiate a sale of stock belonging to third parties and to subject the bank to liability in connection therewith for false representations in the absence of authority, ratification or consideration: Mapes v. Bank, 80 Pa. 163.

False representations are not actionable when plaintiff has knowledge of the falsity thereof at the time they are made: Immel v. Marsh, 58 Pa. Superior Ct., 234; Slaughter v. Gerson, 13 Wallace 383.

At no time in this case did plaintiff complain that any information had been withheld from him.

Under the circumstances disclosed, plaintiff was not entitled to rely on the representation under discussion: Mahaffey v. Ferguson, 156 Pa. 156; Farnsworth v. Duffner, 142 U. S. 47; Ackman v. Jaster, 179 Pa. 463; Sebring v. Brick Co., 292 Pa. 412; Jackman v. Enterprise Co., 256 Pa. 215.

There was no proof of the falsity of the representation as to trade-marks.

A person defrauded waives or condones the alleged fraud by performing an executory contract after knowledge of fraud: Gogel v. Jacoby, 5 S. & R. 117; Hunt v. Gilmore, 59 Pa. 450; Patterson v. Hulings, 10 Pa. 506; Childerston v. Hammon, 9 S. & R. 68; Miller v. Kreiter, 76 Pa. 78; Cochran v. Cutter, 18 Pa. Superior Ct. 282; Kedward v. Campbell, 166 Pa. 365.

Plaintiff is estopped from asserting that a transaction with a third party is a payment for stock by accepting a written agreement from defendant which states that

the transaction was a loan: Mercer M. & Mfg. Co. v. McKee, 77 Pa. 100; High v. Berret, 148 Pa. 261.

Capital stock reports of a corporation are not admissible as evidence of the value of its assets in an action against a stranger: Jarvis v. Bell, 296 Pa. 568; Girard Trust Co. v. Phila., 248 Pa. 179; Hanover Water Co. v. Iron Co., 84 Pa. 279.

The court erred in submitting all of the alleged false representations to the jury.

The court erred in failing to instruct the jury as to the effect of the priority given plaintiff's stock over defendant's bonds.

*O. K. Eaton*, with him *J. R. Sheppard*, for appellee.— It clearly appears that this Highland Coffee Company was a creature of the defendant bank who not only brought it into existence but proceeded to dominate and control it, and in order to procure money to be put in the treasury it agreed to sell Emery the five hundred shares of stock for ten thousand dollars and carried out the transaction.

This sale of stock was a sale by the bank either of its own stock or some of the collateral held by it; it does not therefore state the case fairly to merely say that this was "a sale of stock belonging to third parties."

It is within the rights of a national bank to become the owner of stock in one company which had theretofore been pledged to it in due course: California National Bank v. Kennedy, 167 U. S. 362.

The distinction between a sale by a bank of its own securities and other situations not involving such sale is clear: Weissburg v. Bank, 284 Pa. 260.

A national bank was held liable for damages due to a sale of bonds induced by false representations made by the president of the bank, in the following cases: National Bank & Loan Co. v. Petrie, 189 U. S. 423; Miller v. Trust & Savings Co., 285 Pa. 472; Bos v. Bank,

41 Pa. Superior Ct. 388; Hromaha v. Bank, 50 Pa. Superior Ct., 466; Mapes v. Bank, 80 Pa. 163.

Plaintiff did not, as he testified, have knowledge of the falsity of these representations at the time he purchased. It is true that as a part of the false representations plaintiff said the coffee company was represented to be a prosperous self-sustaining enterprise; the president and cashier of the defendant bank not only made the assertions but gave reasons for it to the plaintiff, largely based upon the alleged possession of certain trade-marks registered in Washington when, according to the testimony of Hamilton, the company had never taken out any such trade-marks: West Homestead Boro. v. Erbeck, 239 Pa. 192.

The material inducement to him to enter into this contract was the representation as to assets and that being false a cause of action accrued.

The Highland Coffee Company never took out any trade-mark, as Hamilton admitted. Nevertheless, they were carried as an asset on the books, according to Hamilton, at $13,624.73. They were hidden under "factory equipment." What the bank did was to put in false and invalid figures as to assets immediately upon organization and this so-called trade-mark asset was one of the means of inflation: Steckel v. Bank, 93 Pa. 376.

If plaintiff's story is true that he purchased stock from the bank for the sum of ten thousand dollars and paid for it, then the purchase was complete upon such payment.

The purchase of the stock and the payment therefor was one contract; the note transaction was another contract; therefore, plaintiff by paying the note did not continue to perform the contract for the purchase of the stock: Miller v. Cent. Trust & Savings Co., 285 Pa. 472.

An examination of the assignments with reference to the admissibility of the capital stock reports will show that they are not supported by an exception and as we understand the authorities they are not therefore as-

signable for error: Righter v. Parry, 266 Pa. 373; Littieri v. Freda, 241 Pa. 21; Ewald v. Trust Co., 43 Pa. Superior Ct. 593.

OPINION BY MR. JUSTICE MAXEY, June 30, 1932:

The plaintiff relying, as he says, on defendant's misrepresentations invested $10,000 in the Highland Coffee Company and lost it when the company became bankrupt. Plaintiff brought suit against the defendant, hereinafter referred to as the bank, for "compensatory and punitive damages," and recovered $10,000 with interest or a total of $12,000. Defendant's motion for judgment n. o. v. was refused.

The assets of Highland Coffee Company, a bankrupt Pennsylvania corporation, were purchased by the bank, and a new corporation called "The Highland Coffee Company" was organized in Delaware with an authorized capital of 1,000 shares of no par value stock. To it was transferred the assets of the former defunct corporation in return for the thousand shares of stock and the company's note for $11,400. R. L. Brumage who had been a factor in the old company became president of the new company. The bank retained 200 shares of the stock of the new company and the balance of 800 shares were issued to the officers and employees of the new company. The 800 shares so issued were pledged to the bank as collateral for the individual note of R. L. Brumage. C. M. Gerwig, then vice-president of the bank, and W. W. Hamilton, then cashier of the bank, became respectively vice-president and treasurer of the new company, as well as directors of it. During the three years of the company's existence from 1923 to 1926, the bank loaned it $50,000 but the only annual dividends were disappointments. Deficits mounted and finally the company's indebtedness to the bank was funded in the form of debenture bonds totalling $64,200 and held by the bank. The financial statement dated March 31, 1926, exhibit No. 1, lists assets as $76,053.32 and liabilities

$7,965.41. Adding the bonded indebtedness of $64,200 to the liabilities, excluding capital stock, the surplus would have been $3,887.91. On exhibit No. 1, the capital stock is debited at a valuation of $20,021.17. Deducting from this liability, the $3,887.91 surplus, there is obtained the last item listed on exhibit No. 1, to wit: "Loss to March 1, 1926, $16,133.26."

In April, 1926, President Brumage of the coffee company sought to interest plaintiff in the enterprise as an investor. Plaintiff visited the plant several times and held several conferences with Brumage and the bookkeeper. Brumage later referred plaintiff to the bank officials. In May, 1926, plaintiff talked with W. W. Hamilton, cashier of the bank and treasurer of the coffee company, and Hamilton described the company as a prosperous, self-sustaining commercial enterprise, and declared that the company had $76,000 of assets, all collectible and good. Plaintiff testified also that a day or two later the president of the bank, W. M. Reed, in the presence of Hamilton, told him (the plaintiff) that the bank needed a man in the company to look after its interests, that it would sell plaintiff 500 shares of the company's stock for $10,000, that if plaintiff invested in the company he could not lose a penny, that there were $76,-000 worth of assets in the company as good as gold, and offered as security for the invited investment of $10,000 to treat it as a debt of the company and give it priority over the $64,200 of the company's debenture bonds held by the bank. Plaintiff then inspected the balance sheet, exhibit No. 1. On plaintiff's third visit to the bank a few days later, he asked Reed the reason for the company's prosperity and Reed replied that they had trademarks registered in Washington which gave them the exclusive right to sell goods of certain popular brands. On May 11, 1926, the bank's officers drafted an agreement reciting that "Robert Emery......has agreed to loan and advance to the Highland Coffee Company the sum of $10,000 in cash" and that the bank agreed "to

grant and give priority to said debt from the Highland Coffee Company to Robert Emery" over the debt from the company to the bank. This was executed by the bank alone and delivered to plaintiff. The latter informed Reed that he didn't have $10,000 available. It was then agreed that plaintiff and his wife should sign a demand judgment note for that amount payable to the bank and thereby secure $10,000 with which to purchase 500 shares of the coffee company's stock. This was done on May 18th. Plaintiff has since paid $9,750 on this obligation, with interest. Plaintiff received 500 shares of stock and was elected treasurer of the company in place of Hamilton. The board of directors consisted of plaintiff, Brumage and Hamilton. Plaintiff worked in the business and received $100 a week. In July he told Reed and Hamilton that the assets were not as represented and that he wanted to return the stock and get his money back. They induced him to remain in the company and told him he would not lose a penny. In October plaintiff took Brumage's place as president of the company. After many unavailing efforts to keep the concern afloat, the company was adjudged bankrupt about a year and a half later. On August 17, 1927, plaintiff brought this suit.

The questions before us are: Was plaintiff justified in relying upon the statements of the bank officials, and, if so, did he suffer such damages as entitled him to the verdict rendered?

The statement charges three specific misrepresentations by bank officials: (1) that the coffee company was prosperous and self-sustaining, (2) that the statement referred to as exhibit No. 1 was a true and correct statement of the assets, and (3) that the company owned certain registered trade-marks of great value.

A misrepresentation as to the subject of a proposed sale will not support an action for deceit if the subject be open to the buyer's observation. In Mahaffey v. Ferguson, 156 Pa. 156, 169, 27 A. 21, this court quoted

approvingly the statement of Chancellor Kent, Commentaries, 2d volume 484-5, that the law does not go to the romantic length of giving indemnity against the consequences of indolence and folly, or a careless indifference to the ordinary and accessible means of information. The same opinion quotes from Slaughter v. Gerson, 13 Wallace 379, as follows: "Where the means of knowledge are at hand and equally available to both parties, and the subject of purchase is alike open to their inspection, if the purchaser does not avail himself of these means and opportunities, he will not be heard to say that he has been deceived by the vendor's misrepresentations." This court has consistently adhered to these principles. See Scott v. Huston, 247 Pa. 536, 93 A. 763; Wilson v. Galena-Signal Oil Co., 275 Pa. 355, 119 A. 471.

Plaintiff could not have credited the representation that the company was in a prosperous and self-sustaining condition when he had before him the financial statement of the company which showed exactly the contrary. That the company had "been losing" money appeared in language so plain that he who runs could read and he who read should have run. This statement showed a net loss of $16,133.26 to March 1, 1926. It showed no cash on hand whatsoever. The proffered agreement, exhibit A, dated May 11, 1926, to grant and give priority to the company's debt of $10,000 "for moneys to be advanced" by Emery distinctly set forth in its first "whereas" clause that the company "is short of working capital and is unable at the present time to pay its debts." While under cross-examination, plaintiff defined a self-sustaining concern as one "that is taking care of itself," that has cash on hand and does not have to borrow. These facts justify the view of the dissenting judge (MACFARLANE) in the court below that the representation that the company was a prosperous and self-sustaining commercial enterprise was "mere seller's talk" and was known by Emery to be false.

The third assignment of error is the court's refusal of defendant's second request for instructions, to the effect that the plaintiff had no right as a reasonable being to rely on the alleged representations that the coffee company was a prosperous and self-sustaining commercial enterprise. This request should have been affirmed. This assignment of error is sustained.

The second misrepresentation charged is as to the value of the assets. Plaintiff presented testimony which, if credited, showed that the actual assets instead of being worth $76,053.32 as represented were worth only $20,520. There was a case here for the jury on the question: Was the value of the assets misrepresented and did plaintiff rely on these misrepresentations? If a man knows the truth about a representation, he is neither deceived nor defrauded and any loss he may sustain is in effect self-inflicted. See 26 C. J., page 1135, and 12 R. C. L., section 108, page 352. It is also the law that if a person to whom misrepresentations are made is in a position to know or ascertain the facts, his knowledge of them may be inferred. But a bare suspicion or an opportunity to learn the truth through the exercise of reasonable diligence does not constitute knowledge of fraud sufficient to prevent recovery. 26 C. J., page 1136, section 56.

The jury had a right to consider the respective situations of the parties to this transaction. The plaintiff describes himself as a mechanical engineer. He says he told the bank president that he (Emery) knew nothing whatsoever about the coffee business. When the former made a statement about the assets of the coffee company, which company the bank had long controlled, Emery had a right to assume that this bank president knew the exact facts as to the financial condition of the company and would disclose them. In Bower v. Fenn, et ux, 90 Pa. 359, a vendee who had no knowledge of the drug store business relied upon the truth of the vendor's statement as to the value of the store and the vendor

permitted the vendee to contract with him on the faith of his statements of value. This court held that the vendee could set up the falsity of the vendor's statement as a defense in an action of ejectment on a mortgage given for a portion of the purchase money. See also Fisher v. Worrall, 5 W. & S., 478, and Edelman et al. v. Latshaw, 180 Pa. 419, 36 A. 926.

The third misstatement alleged was that the company possessed valuable trade-marks. There was no evidence to to their value or lack of value. These were carried on the books at a valuation of $13,624.73. There is evidence which would warrant the inference that these valuable trade-marks existed largely in imagination. Hamilton, cashier of the defendant bank, who also became treasurer of the coffee company, testified that he never "knew anything about the trade-marks at all." Plaintiff, on the other hand, offered no proof of their nonexistence or lack of value.

Appellant also contends that it was beyond the authority of its officers to subject the bank to liability for false representations of the nature charged.

We hold that in this case the interests of the bank were so closely related with those of the coffee company and so completely was the company dominated by the bank, that the latter can justly be held liable for the misrepresentations made obviously in the bank's interest. Not only did Hamilton, the bank's cashier, make the misrepresentations; but also Reed, the president of the bank, who was not officially connected with the coffee company. The latter company was largely indebted to the bank and it was to the interest of the bank that the coffee company's business be galvanized into life by some new money. The fact that the money received from plaintiff went to the coffee company and not to the bank, and that the bank sold not stock owned by it but held by it as collateral, is not decisive of this question. The officers' representations relied on were sufficiently within the apparent scope of the bank's business to subject

it to liability. See Miller v. Central Trust & Savings Co., 285 Pa. 472, 132 A. 579, and Caldwell v. Continental Trust Co., 291 Pa. 35, 139 A. 586.

Appellant also contends that the plaintiff, if defrauded, condoned it by performing an executory contract after knowledge of it. The alleged performance consisted in paying off the $9,750 of the $10,000 note which the plaintiff and his wife executed and discounted at the defendant bank in order to secure the funds for the purchase of the stock. The purchase of the stock and the payment therefor was one contract; the note transaction was another. Therefore, plaintiff, by paying the note, did not continue to perform the contract for the purchase of the stock. The contract had been executed on both sides as soon as plaintiff paid the money to the bank and received the stock. Furthermore, "where one is induced by fraud to make a contract and subsequently discovers the fraud, he may either rescind the contract and sue for damages, or he may elect to affirm the contract and hold the parties liable for fraud and deceit." Miller v. Central Trust & Savings Co., 285 Pa. 472, 486; 132 A. 579.

The bank contends that plaintiff is estopped from claiming that the stock was sold him, by the recital in exhibit A that plaintiff agreed to "loan and advance" his money to the company. This paper was never signed by plaintiff. The question whether or not plaintiff merely loaned $10,000 to the company instead of buying stock was for the jury under proper instructions. All the attendant facts negative the idea of Emery's lending $10,000 to the company. Bank president Reed testified he "knew Emery was buying stock."

Appellant assigns as errors (the 14th, 15th and 16th) the admission in evidence of the capital stock reports of the coffee company for the years 1923, 1924 and 1925. The report for 1923 is signed and sworn to by Brumage, as president, and Hamilton, as treasurer. The latter was at the same time cashier of the defendant bank. The

reports for 1924 and 1925 were signed belatedly by the trustee in bankruptcy. These reports were offered to show knowledge by the bank of the company's assets. They were admitted over objection. No exception was asked for or noted. An assignment of error is fatally defective if it fails to, inter alia, set forth that an exception was taken to the refusal of the court to admit or reject (as the case may be) the proffered evidence: Com. v. Williams, 304 Pa. 299, 156 A. 86. If the 14th, 15th and 16th assignments of error were in proper form, i. e., if exceptions had been noted and had been duly set forth in the assignments, they would be sustained. The capital stock report of the coffee company for 1923 was not admissible in a suit by the plaintiff against another corporation even though this other corporation owned stock in the company to which the report relates. The reports for 1924 and 1925 belatedly signed by the trustee in bankruptcy were clearly not admissible. They were mere heresay.

The thirteenth assignment of error is: "The court erred in its charge to the jury as follows: 'The plaintiff contends that this stock had no value at the time he bought it and he bases that contention upon the testimony of Mr. Hamilton. He says that he paid $10,000 for the stock. If from these returns you find that this stock had value at the time he purchased it, then his loss would be the difference between the $10,000 he paid for the stock and the value of it at that time. If it had no value at that time, then he suffered a loss of the full amount of the money he put into it. If it had value, if it was worth $10,000 at the time, then he suffered no loss; but, as I say, if it was worth less, if it had some value, he would suffer a loss of the difference between what its value was at that time and the $10,000 he paid for it.' " If the jury found—as the evidence indicates—that the transaction between plaintiff and the coffee company was not a loan, the measure of damages laid down by the trial judge as governing this case is not

questioned by the appellant, but the latter says in its argument that it "does except to the subject-matter as laid down by the trial judge to which said measure of damages was to be applied." There is much merit in defendant's contention that the stock had some value at the time Emery bought it, assuming that the jury found that he did buy it. The 1925 capital stock tax report offered in evidence by plaintiff showed that the company returned for tax purposes assets of an actual value of $55,256.38, as of December 31, 1925. It also showed liabilities exclusive of the postponed debenture bonds and of the capital stock, amounting only to $7,727.69. There is no evidence that these assets had been substantially diminished by May 19, 1926, the date of plaintiff's purchase. Futhermore, when the company received plaintiff's $10,000, its assets were increased by that amount. It is obvious therefore that after the payment of current liabilities, and assuming that the stock of plaintiff was given priority over the $64,200 of the coffee company's debenture bonds held by the bank, there were sufficient assets in the company to make plaintiff's stock of considerable value had liquidation been resorted to at the time or shortly after the time plaintiff bought his stock. Plaintiff's testimony as to his priority over the debenture bonds is in substance that the president of the bank promised to give him (the plaintiff) priority over the $64,200 debenture bonds and delivered to him an agreement embodying that promise, on the day prior to the signing of the $10,000 note and before he, Emery, paid the money to the coffee company, and it was some days after that that he received certificates for the 500 shares of stock of the Highland Coffee Company.

For measuring damages arising from fraud and deceit there are two formulas applied in differing jurisdictions. There is the contract-warranty rule which allows the plaintiff to recover the difference between the actual and represented value of the property he purchased. This rule gives the deceived plaintiff the value of his bargain.

It is recognized in the following cases: Morse v. Hutchins, 102 Mass. 439; Antle v. Sexton, 137 Ill. 410, s. c. 27 N. E. 691; Estes v. Odom, 91 Ga. 600, s. c. 18 S. E. 355; Molnar v. Beriswell, 122 Ohio St. 348, s. c. 171 N. E. 593. The second rule called the tort rule permits the plaintiff to recover only his actual loss. This rule prevails in Pennsylvania. "The measure of damages in an action of deceit for fraud in the sale of stock is the difference between what the plaintiff was induced to pay for the stock and its actual value at the time of the purchase": Curtis v. Buzard, 254 Pa. 61, 64, 98 A. 777.

"The measure of damages in an action for deceit in the sale of stock is the difference between the real value of the stock at the time of the sale and the fictitious value at which plaintiff was induced to purchase it. It's the money he parted with without receiving an equivalent therefor": High v. Berret, 148 Pa. 261, 23 A. 1004.

When this case is re-tried the jury should be clearly instructed that in determining plaintiff's loss, if any, it is the value of the stock at the time plaintiff purchased it and not its value after the coffee company became bankrupt a year and a half later that is the subtrahend of the problem.

"Since a defrauded party should make a reasonable effort to avoid injury, he cannot recover damages which could have been avoided by reasonable care and are therefore to be regarded as not proximately due to the fraud": 27 C. J., page 85, section 230. "One must not suffer himself to become an indolent victim of fraud": Stedman v. Boone, 49 Ind. 469.

The burden of proving that the value of the stock in question was less than he paid for it was on the plaintiff. In determining its value at the time he bought it, the value of the assets of the company is a material factor. The fact that the defendant bank both orally and in writing agreed to give the $10,000 "advanced as working capital" to the coffee company by the purchase of the stock, priority over the debt from the coffee company to

the Third National Bank and "to the lien of any bonds or other obligations evidencing same and to the lien of any claim or demand based on said debt as against the property or assets of said Highland Coffee Company," affected the stock's value favorably. The appellant justly complains that the charge failed to include any mention of this priority right.

The actual value of the coffee company's stock purchased by plaintiff is not susceptible of mathematical proof. To show its alleged deficiency in value at the time stated, plaintiff must rely on the best proof practically obtainable. Any competent evidence tending logically to throw light on the question of the value of the stock at the time would be admissible. As WIGMORE says in his Treatise on Evidence, 2d edition, volume 1, section 29: "The judges' function in determining relevancy is not that of final arbiters, but merely of preliminary testers, i. e., that the evidentiary fact offered does not need to have strong, full, superlative probation value, does not need to involve demonstration or to produce persuasion by its sole and intrinsic force, but merely to be worth consideration by the jury. It is for the jury to give it the appropriate weight in effecting persuasion;......a mere capacity to help in demonstration is enough for its admission."

Instructions substantially in accordance with these principles should be given the jury when this case is retried, to guide it in measuring the damages, if any, plaintiff sustained by reason of the misrepresentations (if so found) of defendant.

The judgment of the court below is reversed and a venire facias de novo awarded.