CLEVELAND WRECKING CO. OF CINCINNATI v. FEDERAL DEPOSIT INS. CORPORATION.

No. 3534.

District Court, E. D. Pennsylvania.

Aug. 16, 1946.

Manuel Fleisher, of Philadelphia, Pa., for plaintiff.

Allen S. Olmsted, II, of Philadelphia, Pa., for defendant.

KALODNER, District Judge.

This action was brought by the plaintiff, a Delaware corporation duly authorized to do business in Pennsylvania, against the Federal Deposit Insurance Corporation, an instrumentality of the United States, to recover damages for breach of an agreement of sale.

The cause having come on to be heard before the Court without a jury, after

consideration of the pleadings and the evidence, I make the following

### Findings of Fact

1. The plaintiff, Cleveland Wrecking Company of Cincinnati, at all times material herein was, and is, a corporation organized under the laws of Delaware, and duly registered and authorized to do business in Pennsylvania.

2. The defendant, Federal Deposit Insurance Corporation, at all times material herein, was, and is, a corporation of the United States, duly created by Act of Congress, June 16, 1933, 48 Stat. 168, as amended, 12 U.S.C.A. § 264 et seq.

3. At all times herein material, the defendant, Federal Deposit Insurance Corporation, owned a tract of land in the Borough of Emmaus, Lehigh County, Pennsylvania, known as the "Crumwold Furnace Property," which it had acquired in the course of liquidation of the Emaus National Bank, a national bank located at Emmaus, Lehigh County, Pennsylvania.

4. At all times herein material, there was situated on the "Crumwold Furnace Property" a steel frame building formerly used as a caste house in connection with furnace operations.

5. The "Crumwold Furnace Property" was subject to tax liens of the Borough of Emmaus, the School District of Emmaus, and the County of Lehigh, in a total amount in excess of $2500.

6. At all times herein material, the defendant was represented by one Edward S. Appel, Liquidator, who had direct supervision over the assets of the Emaus National Bank, in liquidation.

7. On or about December 31, 1942, the plaintiff, acting by its agent and general superintendent, one I. M. Sogg, verbally proposed to Edward S. Appel, to purchase from the defendant the cast house located on the Crumwold Furnace Property, for the sum of $500, free clear of all encumbrances, the plaintiff to dismantle and remove said building from the premises without further cost to the defendant.

8. Appel told Sogg that the Federal Deposit Insurance Corporation did not warrant or guarantee title; that there were certain tax liens existing against the "Crumwold Furnace Property"; that he could not give a bill of sale for the cast house unless the tax liens were cleared off; that his authority was limited to submitting the offer together with his recommendation to the Main Office, and that if "they" approved of the sale, he would endeavor to effect a settlement, by compromise, with the taxing authorities.

9. It was understood that the plaintiff was not to pay the taxes, but that defendant would take care of the taxes. Appel intended to pay the tax arrears out of the proceeds of the sale.

10. Sogg delivered to Appel a deposit in the amount of $100 and received a receipt therefor.

11. Appel contacted the solicitor for the Borough of Emmaus with a view to compromising the tax liens. The solicitor for the Borough agreed to take twenty-five per cent of the purchase price. Appel was under the impression that he had settled all the tax liens, but in fact he had settled only the claim of the Borough. He did not communicate to Sogg the conversation he had with the solicitor of the Borough.

12. Sometime between December 31, 1942, and April 3, 1943, Appel told Sogg, in a telephone conversation, that "We have got everything cleared off now," but that he had better increase his offer. In compliance with the request, the offer was increased to $610, the terms and conditions of the agreement to remain the same.

13. The statement that everything is cleared off, tended to induce the plaintiff to purchase the cast house, and plaintiff relied upon the statement.

14. On April 3, 1943, Appel wrote to Sogg stating that he was authorized to accept the offer for the purchase of the cast house, and that Sogg could set a date to take delivery.

15. On April 15, 1943, Sogg and Appel met, and Sogg gave Appel a check to the order of defendant dated April 14, 1943 in the amount of $510. Sogg executed a "Certificate of Settlement or Sale."

16. Said certificate was in the form of a letter to the defendant in Washington and

stated: "Under an agreement of sale made with Edward S. Appel Liquidator of the Emaus National Bank of Emmaus, Pennsylvania, I hereby certify that on April 15, 1943, I delivered to said Liquidator the sum of $610.00 in cash and (detail) as the full purchase price of the cast house located on the Crumwold Furnace Property." The certificate was signed by Sogg for the plaintiff. Below Sogg's signature there appears a "Memorandum by Liquidator," which reads,

"Liquidator's Letter
of recommendation    Date March 5, 1943
"Office letter of approval    Date March 29, 1943
"Asset No. 158
"Loan to: AP 94."

17. The "office letter of approval" was a letter from Appel's superior to Appel, and stated, inter alia, that in reliance upon Appel's representations and recommendation, he was authorized to accept the offer of $610 made by the plaintiff and to pay the Borough of Emmaus the amount of the commitment to it. The letter further stated that it was to be understood that the proposed sale was to be made without any warranty of title.

18. At the meeting of April 15, 1943, Appel gave Sogg from two to four months to remove the cast house.

19. Nothing was said during the negotiations as to the kind of steel contained in the cast house, that is, whether the steel was scrap or prefabricated. Sogg did not represent to Appel that it was scrap steel.

20. In June or July, 1943, plaintiff's subcontractor, Max Corchin, Inc., entered upon the Crumwold Furnace Property to dismantle and remove the cast house.

21. Two or three days after the work of demolition had begun, a police officer of the Borough of Emmaus, acting at the request of the Emmaus School District, told plaintiff's subcontractor to desist and threatened arrest. The police officer acted without defendant's knowledge. Plaintiff's subcontractor ceased working and Sogg immediately contacted Appel, who advised Sogg not to do anything for a couple of days and he would straighten things out.

22. On June 30, 1943, the Emmaus School District instituted proceedings of scire facias sur tax lien in the Common Pleas Court of Lehigh County, Pennsylvania, and on August 13, 1943, the Crumwold Furnace Property, including the cast house was offered up at judicial sale and purchased by the Emmaus School District.

23. Attempts of Appel to straighten out the difficulty failed, and on or about August 28, 1943, Appel wrote to Sogg stating that he was authorized to return the purchase price of $610. The offer to refund was rejected.

24. The cast house contained thirty-five tons of steel having a market value of $55 per ton, or a total of $1925, exclusive of costs of dismantling and removing.

25. Plaintiff incurred expenses in the amount of $220.28 in dismantling the cast house.

## Discussion

It is necessary at the outset to properly classify the agreement between the parties herein. It is, in essence, an agreement of sale of a cast house, which, at the time of the contract, was affixed to the land, and contemplated the severance or removal therefrom within the time necessary to accomplish the severence.

The Pennsylvania Sales Act appears to be applicable. Thus, Act May 19, 1915, P. L. 543, § 76, 69 P.S. § 337, defines the term "Goods" to "include all chattels personal other than things in action and money. The term includes emblements, industrial growing crops, *and things attached to or forming part of the land which are agreed to be severed before sale or under the contract of sale.*" [1] (Emphasis supplied.)

---

[1] No Pennsylvania case classifying contracts to sell a building has been called to the attention of the Court. As to sale of standing timber to be severed, in Havens v. Pearson, 1939, 334 Pa. 570, 6 A.2d 84, 122 A.L.R. 512, it was declared that it is a question of intent whether a sale of realty or of personalty was accomplished. Such a holding depends upon whether the thing was to be severed within a time reasonably necessary therefor, and the fact that a definite time is fixed is immaterial. That the Sales Act apparently requires a holding that a contract of sale of trees comes within the Sales Act where the sever-

There can be no doubt that the Pennsylvania statute of frauds, P. L. 543, § 4, as amended, 69 P.S. § 42, has been satisfied.

■ It is the contention of the defendant that, conceding that the contract amounted to a constructive severance of the cast house, the plaintiff, despite the tax sale, is still entitled to remove the structure. Considering that the tax liens attached prior to the execution of the agreement of sale, this cannot be so under Pennsylvania law. In Havens v. Pearson, 1939, 334 Pa. 570, at page 574, 6 A.2d 84, at page 87, 122 A.L.R. 512, the Supreme Court of Pennsylvania had before it a similar question and it stated:

· "Assuming that the contract was a sale of personalty, what was its effect upon the lien of the judgment on the land, which then included the timber? Appellant insists that instantly there was a complete severance. He says that since Detwiler, the judgment-debtor and owner, had a right to sell and cut the standing timber, free of the lien, the effect of this contract was to sever the trees from the realty and convert them into personalty even though all or part remained standing on the land. As between vendor and vendee this conclusion may be correct. Vendee acquired title to such trees as he cut and removed, as chattels, *but, as to the judgment-creditor, the agreement did not create the fiction of an immediate severance and conversion of all timber within the 1300 acres. The standing timber was part of the 'freehold under the judgment, and though sold as personalty, it continued to be realty as to the judgment."* (Emphasis supplied.)

And further, 334 Pa. at page 575, 6 A.2d at page 87, 122 A.L.R. 512:

"The vendor could not, at his election, with the aid of a legal fiction, destroy the rights of the lien or remove the standing timber from the effect of the lien. As Justice Sharswood said in Foster's Appeal, 74 Pa. 391, 398, 15 Am.Rep. 553: 'Surely it will not be pretended that a man could by a mere declaration of record convert his land into personalty, so as to defeat the lien of mortgages, judgments and other encumbrances * * *.' The timber remaining on the land at the time of the sheriff's sale, passed to appellee as purchaser. Leidy v. Proctor, 97 Pa. 486."

Although the Havens case involved a judgment-creditor, who, in Pennsylvania, has greater rights than the taxing authorities as to enforcement of liens, Derry Township School District v. Barnett Coal Co., 1938, 332 Pa. 174, 2 A.2d 758, the broad language used in the above quotations does not furnish a basis of distinction on that ground, particularly in view of the treatment accorded in the Havens case to the case of Vogelbacker v. Walker, 7 Pa. Dist. & Co. R. 661. Apparently, the purchaser succeeds in freeing of the lien only so much of the res as he has actually severed; the effect of the law is to cause a race between the purchaser and the lien-holder, whether the lienholder may prevent the severance by a bill in equity or only by judicial · sale. Cf. Havens v. Pearson, supra, with Derry Township School District v. Barnett Coal Co., supra.

■ The plaintiff contends that the defendant is liable on the ground of breach of an express warranty of title. However, crediting the testimony of Appel in this respect, I have found as a fact that Appel told Sogg that the Federal Deposit Insurance did not give any warranty or guarantee of title. Consequently no liability may be based on the broad ground of warranty of title.

Nevertheless, the record at once discloses that the matter of the tax liens was accord-

---

ance, at least, is immediate, see 1 Williston, Sales (2d ed., 1924) Sec. 62. As to buildings, see 1 Williston, Sales, Sec. 66. The decision in the Havens case, despite the failure of reference to the Sales Act (since under the facts of the case the question of intention was not subject to disagreement) nevertheless seems to be in accord with the Sales Act approach as signified in Williston.

There seems no reason to apply a different rule as to buildings, although it would seem that the sale of a building would be a clearer case. See Wetkopsky v. New Haven Gas Light Company, 88 Conn. 1, 90 A. 30, Ann.Cas.1916D, 968; 50 Corpus Juris, page 769. The Sales Act would seem necessarily to apply to a contract such as is here involved. See 1 Williston, Sales, Sec. 66.

ed special consideration by the parties. It was understood, as testified by Appel, that the plaintiff was not to pay the tax arrears, that is, it was not taking the cast house subject to the taxes. Indeed, considering the purchase price and the maximum value of the cast house, as calculated by the plaintiff, it is apparent that the plaintiff could hardly have intended to take the structure subject to the taxes. Moreover, as Appel further testified, defendant was to pay the taxes. Appel contemplated, as he told Sogg, that he would clear off the taxes by compromise, paying the necessary amount out of the purchase price. It may be said, then, that Sogg would not have taken the cast house subject to the liens, and that Appel would not have accepted the purchase offer if either a compromise could not be effected with the taxing authorities, or if the amount of the compromise could not have been paid out of the purchase price.

In addition, important notice must be given the fact that Appel told Sogg that he could not give a bill of sale until the tax matter was cleared, and that if he were authorized to make the sale he would endeavor to clear off the encumbrance. Eventually, Appel did tell Sogg that he had cleared off the tax liens.

■ Under the Pennsylvania Sales Act, May 19, 1915, P.L. 543, § 12, 69 P.S. § 121, "Any affirmation of fact or any promise by the seller relating to the goods is an express warranty if the natural tendency of such affirmation or promise is to induce the buyer to purchase the goods * * *." Since it is clear that neither party intended to enter into the agreement of sale unless the tax liens were satisfactorily cleared off, at least by compromise, the affirmation of Appel, that the tax liens had been satisfactorily compromised, when in fact they had not, naturally tended to induce Sogg to purchase

the cast house. Accordingly, in my opinion, Appel's affirmation constituted an express warranty, breached at the time it was made.[2]

It may be observed that considering the circumstances, even if Appel had not informed Sogg that the tax matter was cleared, a strong case for breach of warranty might nevertheless be made out. Thus, the understanding of the parties was that Appel would not give a bill of sale unless the tax matter was settled. Between December 31, 1942, and April 3, 1943, as both parties testified, Sogg was frequently in contact with Appel. According to Sogg, Appel informed him the delay was caused by the attempt to settle the tax claims. Therefore, when Appel accepted Sogg's offer, it was equivalent to an affirmation that the tax matter had been settled.

Defendant raises the issue of Appel's authority to give a warranty of title. Since it is found as a fact that no general warranty of title was made, the argument need not be explored further in that regard. Nevertheless, as has been determined, Appel did warrant that he had cleared off the tax claims, and the asserted limitation of Appel's authority deserves to be answered.

Defendant offered in evidence as setting out the limits of Appel's authority a letter dated March 29, 1943, from Appel's superior in Chicago, Illinois, to Appel. The substance of that letter, described as confidential by Appel, is set forth in Finding of Fact No. 17. Plaintiff objected to the letter on the ground that it was not shown to the plaintiff or its agent at the time of the transaction. The theory of the objection, evidently, was that the letter contained secret limitations on the authority of the defendant's agent which should not bind the plaintiff. Although the objection was at first sustained, upon request of the de-

---

[2] The law of sales does not distinguish between a representation and warranty, where the representation induces a bargain. 1 Williston, Sales (2d ed. 1924) Section 197. Prior to the adoption of the Uniform Sales Act in Pennsylvania in 1915, the assertion of a fact did not constitute an express warranty of its truthfulness unless there was shown an intention to be bound. Rothermel v. Phillips, 1928, 292 Pa. 371, 372, 375, 141 A. 241, 61 A.L.R. 489; see also 1 Williston, Sales, Sec. 199, and cases discussed therein. However, the Sales Act requires a different conclusion. See 1 Williston, Sales, page 378. This conclusion has now been made effective by decision in Penna. Cf. Montgomery F. & F. Co. v. Hall T. M. M. Co., 1925, 282 Pa. 212, 213, 215, 127 A. 633; Yonker v. Vaneer, 1927, 91 Pa.Super. 157, 161.

fendant, decision on the admissibility of the letter was reserved.

■ The letter discloses that Appel's authority was coordinate with the authority actually exercised by him. Thus, it conferred authority upon him to accept plaintiff's offer, a fact Appel communicated to Sogg, and authority to pay the Borough of Emmaus, which amounts to a ratification of Appel's action with respect to the tax claims. The letter further indicates a knowledge on the part of the corporation of Appel's action, and inferentially approves thereof. Even if it is assumed that the letter did not specifically authorize, or at least ratify, Appel's representation to Sogg, it is evident that the corporation was fully apprized of the facts and could reasonably have inferred therefrom that Appel would state to Sogg that he had settled the tax claims. Accordingly, Appel exercised actual expressed, or implied authority. The letter, therefore, may be admitted into evidence for the purpose defendant sought, to show Appel's authority.[3] Plaintiff can hardly be injured in view of the finding that plaintiff's agent was informed, orally, that the corporation gave no warranty of title.

■ Under well-settled principles of agency law, the corporation is liable for the acts of its agent within the scope of his authority. A.L.I. Restatement of the Law of Agency, Sections 144, 145. Particularly should this be so in the instant case, where the principal has received the benefit of the contract. The representation that the tax claims were settled takes on the cloak of warranty of the fact only as a result of operation of the law.[4]

■ Coming now to the matter of damages, the Sales Act provides that "the measure of damages for breach of warranty is the loss directly and naturally resulting, in the ordinary course of events, from the breach of warranty." 69 P.S. § 314(6). Plaintiff, accordingly, is entitled to recover the market value of the chattel and such other damages as directly and naturally resulted from the breach. 2 Williston, Sales, 2d Ed., 1924, Section 615a.

■ As to the value of the steel contained in the cast house, plaintiff and defendant have stipulated that their experts, if they had testified, would have valued the steel at $1925 and at $600, respectively. The plaintiff's evidence discloses that its valuation is placed on the steel as prefabricated steel, and the defendant's evidence shows its valuation is on the basis of scrap steel. The valuation by plaintiff is con-

---

3 Two possible questions are obviated: (1) How far the doctrine, that one dealing with a government agent is bound to discover the extent of the agent's authority, is applicable here; (2) whether the letter would be admissible in any event, since its existence was disclosed on the "Certificate of Settlement or Sale" which Sogg executed. As to the first question, it is doubted that the doctrine is applicable here. Appel's authority was to make the sale; further, the defendant is a corporate entity given the general power "to make contracts." 12 U.S.C.A. § 264 (j) (Third). No limitation upon that power is found in the statutes, nor do the regulations of the defendant bear on the authority of its agents in this respect.

4 Rescission could be had in an action sounding in contract. Gross v. William Penn Fire Ins. Co., 1944, 51 Pa.Dist. & Co.R. 296; 5 Williston, Contracts (Rev. ed., 1937) Sec. 1500; A.L.I.Restatement of the Law of Contracts, Section 470(1); A.L.I.Restatement of the Law of Restitution, Section 28(b). On the record herein, an action sounding in tort, on the ground of misrepresentation, albeit honest misrepresentation, would also be available to the plaintiff. If the action sounded in tort, under the circumstances of this case, damages would be recoverable, reliance being justified. Cf. Bower v. Fenn, 1879, 90 Pa. 359, 35 Am.Rep. 662; Emery v. Third National Bank, 1934, 314 Pa. 544, 171 A. 881; see also 5 Williston, Contracts (Rev. ed., 1937) Sections 1501, 1508, 1510; Note, (1938) U. of Pa.L.Rev. 435. For a terse statement of the confusion prevailing in the treatment of this matter, see Bohlen, Misrepresentation as Deceit, Negligence, or Warranty (1929) 42 Harv.L.Rev. 733. In Pennsylvania, as to tort actions, it is sufficient if the representor ought to have known, Emery v. Third National Bank, supra, and damages follow not the contract warranty rule, but the tort rule, Emery v. Third National Bank, 1932, 308 Pa. 504, 517, 518, 162 A. 281.

sistent with the price fixed by the Office of Price Administration.

The testimony offered on behalf of the plaintiff clearly reveals that it purchased the cast house considering the steel contained therein to be prefabricated steel, that is, steel which could be dismantled and re-erected. The defendant's agent considered it scrap steel, that is steel to be sent to a mill to be melted. The evidence was that scrap steel had a value of approximately $13 per gross ton, loaded on cars. It is inconceivable that the plaintiff would have paid $610 for the cast house when it could have sold the thirty-five tons of steel for only $455. This is rendered even more remote by the fact that plaintiff assumed the cost of demolition and, to obtain the price of $13 per ton, would have had to load the steel on trucks, remove it to a railroad siding, and reload it on cars. Under such circumstances, the testimony of Sogg, that if the steel were scrap, the best offer it could have made was to remove the cast house for the steel contained in it, without more, seems reasonable.

It should be noted that the transaction between the parties was at "arms length," and plaintiff owed defendant no duty of advising it of the value of the steel or the uses to which it could be put. Moreover, Appel testified he had a familiarity with property, and according to the record, he had the cast house appraised. It is contended by the defendant that Sogg told Appel the steel was scrap and therefore the plaintiff should be estopped to assert a higher value. However, without consideration of the merit of that argument I credit the testimony of Sogg that nothing was said, during the period of negotiations, about the kind of steel the cast house contained. I am convinced, further, that Sogg did not represent to Appel that the steel was scrap.

The Court is of the opinion that the market value of the steel contained in the cast house was $1925, exclusive of the costs of dismantling. Since the plaintiff has paid the full purchase price, it is entitled to recover the full market value. Also the plaintiff incurred expenses in the amount of $220.28 in the dismantling of the cast house. Since the parties contemplated the removal of the cast house, this expense constitutes a loss directly and naturally resulting from the breach. Plaintiff, therefore, should also recover that amount. See Rex Auto Exchange v. Hoffman, Inc., 1925, 84 Pa.Super. 369.

Accordingly, I state the following

Conclusions of Law

1. This Court has jurisdiction of the parties and of the subject matter of this controversy.

2. Plaintiff, through its authorized agent, and defendant, through its authorized agent, entered into an agreement of sale of a cast house owned by the defendant.

3. Defendant's agent, within the scope of his authority, represented to the plaintiff's agent that he had settled and compromised all the tax liens outstanding against the subject of sale. Such representation constituted a warranty, and being untrue, was breached at the time it was made.

4. Plaintiff, having paid the full purchase price under the agreement of sale, is entitled to recover from the defendant the market value of the steel contained in the cast house, in the amount of $1925 and other expenses incurred as a direct and natural result of the breach, in the amount of $220.28, or a total of $2145.28.

An order may be entered in accordance herewith.