## Scaife Company, Appellant, *v.* Rockwell-Standard Corporation, Appellant.

Argued December 1, 1970. Before BELL, C. J., JONES, COHEN, EAGEN, O'BRIEN, and ROBERTS, JJ.

reargument refused January 26, 1972.

*Philip H. Strubing,* with him *Edith G. Laver, Morris M. Berger, C. William Berger, Michael Hahalyak, Pepper, Hamilton & Scheetz,* and *Berger & Kapetan,* for plaintiff.

*John C. Bane, Jr.,* with him *J. Tomlinson Fort, John H. Scott, Jr., William F. Swanson, Jr., Albert M. Wiggins, Jr.,* and *Reed, Smith, Shaw & McClay,* for defendant.

OPINION BY MR. JUSTICE JONES, December 20, 1971:
Following a trial by jury, a verdict was rendered in favor of Scaife Company (plaintiff below and appellant in No. 43 March Term, 1970) and against Rockwell-Standard Corporation (defendant below and appel-

lant in No. 41 March Term, 1970) in the amount of $1,200,000.28.[1] While the court en banc denied Rockwell's motions for judgment n.o.v. and for a new trial, a new trial on the issue of damages was ordered unless Scaife filed a remittur damnum in the amount of $756,-001.28. Upon Scaife's failure to file this remittitur, the court below ordered a new trial limited solely to the question of damages and these cross appeals followed.

A narration of the factual background of these appeals begins with Rockwell's merger on October 30, 1953, with the Timken-Detroit Axle Company and the concomitant acquisition of the Timken Silent Automatic (hereinafter TSA) division as a part of Rockwell's corporate structure. Although the TSA product was long considered the best in the oil-fired furnace industry, this type of business was far removed from Rockwell's chief concern, the manufacture of automotive parts. Moreover, reflecting the improvement and expansion of natural gas line facilities in the United States, the fuel furnace industry was drastically changing from oil-fired furnaces to natural gas-fired furnaces. Attempting to meet the challenge of its competitors, TSA developed and marketed its own gas-fired furnace.

Besides this factual discussion, an explanation of the mechanical operation of a gas-fired furnace is necessary. The key component of a gas-fired furnace, simple but indispensable, is the heat exchanger. However, the TSA heat exchanger was defective in two respects: it was noisy and it cracked. As best stated by the court below, "[f]or a Timken Silent Automatic furnace to make noise is one thing but for it to crack is another." For this reason the TSA gas-fired furnace was not functional and, therefore, not marketable.

---

[1] The jury awarded damages of $810,811.00, and interest of $389,189.28.

Although it is a matter of some dispute whether Rockwell or Scaife initiated negotiations for the sale and purchase of the TSA division, negotiations did commence in the Fall of 1954. Reviewing the record, one fact is abundantly clear: Rockwell was very much aware of the defective condition of its heat exchanger and the effect of this defective component on the marketability of its final product. Besides numerous complaints by customers, Rockwell's cognizance of this problem is demonstrated, *inter alia,* by (1) its creation of a Heating Committee to scrutinize the situation; (2) its unavailing, trial-and-error method of improvement; and (3) Rockwell's establishment of an accounting reserve of $26,000.00 per month to permit the writing-off of the heat exchangers. To capsulize the controversy, Scaife allegedly knew none of these facts when the contract for the sale of the TSA division was executed on March 31, 1955.

For a period of many months, no allegation of fraud was pressed by Scaife and Scaife successfully developed a new type of heat exchanger. However, claiming that damage was already done, a complaint employing four theories of recovery was filed by Scaife. After receiving the evidence, the trial judge ruled that Scaife could go to the jury on only one of these theories: fraudulent misrepresentation.[2] At this point we deem it wise to separate our discussion of these appeals.

## No. 41 March Term, 1970

The primary issue of this appeal by Rockwell is whether there is sufficient evidence of fraudulent mis-

---

[2] The three other theories were breach of contract, breach of warranties and unjust enrichment. The trial judge's rejection of these theories was not assigned as error before either the court en banc or this Court. Hence we will not consider this point.

representation to justify the jury's verdict. Of course, if the evidence does not establish Rockwell's liability, we need not reach the issue presented by Scaife's appeal, No. 43 March Term, 1970, concerning the amount of damages.

Summarizing the essential elements of this cause of action, Mr. Justice (later Chief Justice) JONES in *Neuman v. Corn Exchange Nat. Bank and Trust Co.*, 356 Pa. 442, 450, 51 A. 2d 759, 763 (1947), stated, "there must be (1) a misrepresentation, (2) a fraudulent utterance thereof, (3) an intention by the maker that the recipient will thereby be induced to act, (4) justifiable reliance by the recipient upon the misrepresentation and (5) damage to the recipient as the proximate result." *Accord, Eden Roc Country Club v. Mullhauser*, 416 Pa. 61, 204 A. 2d 465 (1964); *Savitz v. Weinstein*, 395 Pa. 173, 149 A. 2d 110 (1959). Concerning the proof of fraud, our cases have consistently enunciated a very high standard. *E.g., Yoo Hoo Bottling Co., Inc. v. Leibowitz*, 432 Pa. 117, 247 A. 2d 469 (1968) ("clear, precise and convincing"); *Gerfin v. Colonial Smelting and Refining Co., Inc.*, 374 Pa. 66, 97 A. 2d 71 (1953) ("clear, precise and indubitable"); *New York Life Ins. Co. v. Brandwene*, 316 Pa. 218, 172 Atl. 669 (1934) ("clear and satisfactory"). The question then becomes whether Scaife's proof of every element met this exacting standard.

Combining the first and second criteria, we must examine whether a fraudulent misrepresentation was uttered. Initially, we note that a fraudulent misrepresentation can take many forms: " 'fraud consists in anything calculated to deceive, whether by single act or combination, or by suppression of truth, or a suggestion of what is false, whether it be direct falsehood or by innuendo, by speech or silence, word of mouth, or look or gesture. It is any artifice by which a person is de-

ceived to his disadvantage': [Citation omitted]." *Reichert Estate,* 356 Pa. 269, 274, 51 A. 2d 615, 617 (1947). Besides our previous recitation of the facts, additional evidence in this regard, both documentary and testimonial, are very pertinent.

First, during the negotiations, Scaife submitted twenty-six questions to Rockwell concerning the TSA division, including, *inter alia*: "why is this division for sale?" and "what reasons for declining sales volume and faster decline of profits for recent years?" Despite Rockwell's awareness of the defective heat exchanger, no mention was made of this factor. Second, Scaife was not permitted to question TSA's engineers and retail dealers during the negotiations. Third, testimony by various Scaife executives, if believed, indicated that any hint of trouble was excused by Rockwell officials as minor problems encountered daily by manufacturers. In light of the enormity of TSA's problem, we cannot reject the jury's implicit finding that Rockwell either deliberately evaded or actively concealed the true situation. Overall, we share the opinion of the court en banc that, "there was sufficient evidence for the Court, as a matter of law, to submit to the jury and to justify the jury's finding that there was a false misrepresentation."

The third element—an intention by the maker that the recipient would thereby be induced to act—is easily satisfied. The rosy picture painted by Rockwell during the course of the negotiations, coupled with Rockwell's failure to disclose the malfunctioning of its heat exchanger, clearly supports the jury's verdict.

Although neither party has specifically focused its argument on the fourth criterion—justifiable reliance—it is evident from the facts stressed by each side that the crux of the legal controversy concerns this issue. Relying heavily on *Emery v. Third Nat'l Bank,* 308 Pa. 504, 162 Atl. 281 (1932), Rockwell principally argues that

Scaife knew or should have known of the defective heat exchanger and that any damage was essentially self-inflicted. On the other hand, one major facet of Scaife's position, discussed by the court in its charge, is that the long-standing business and personal relationship between the executives of each corporation, while not attaining the legalistic stature of a "confidential relationship", could justify a factual finding that Scaife reposed a specific confidence in Rockwell which was knowingly abused by Rockwell.

In *Emery*, this Court stated: "A misrepresentation as to the subject of a proposed sale will not support an action for deceit if the subject be open to the buyer's observation. In Mahaffey v. Ferguson, 156 Pa. 156, 169, 27 A. 21, this court quoted approvingly the statement of Chancellor Kent, Commentaries, 2d volume 484-5, that the law does not go to the romantic length of giving indemnity against the consequences of indolence and folly, or a careless indifference to the ordinary and accessible means of information. The same opinion quotes from Slaughter v. Gerson, 13 Wallace 379, as follows: 'Where the means of knowledge are at hand and equally available to both parties, and the subject of purchase is alike open to their inspection, if the purchaser does not avail himself of these means and opportunities, he will not be heard to say that he has been deceived by the vendor's misrepresentations.' This court has consistently adhered to these principles. [Citations omitted]." 308 Pa. at 511-12, 162 Atl. at 283. Utilizing this concept, Rockwell accentuates certain facts: (1) several marketing and engineering reports indicated TSA's sluggish entry into the gas furnace market; (2) Scaife executives had, at least, a glimmering of this problem; and (3) Dr. Anthony, a metallurgical engineer employed by the Mellon Institute, testified that it would be obvious from an inspection of the heat

exchanger testing room (a Scaife official and Scaife's chief engineer had toured one of these rooms) that the heat exchanger was defective. However, the evidence introduced by Scaife repudiated each of these allegations. Owing to this extremely close, factual controversy occasioned by our rigorous standard of review as well as the possibility of a specific confidence reposed by Scaife in Rockwell, we believe the trial judge did not err in allowing this case to go to the jury and that the jury's verdict is sufficiently supported by the evidence.

On these facts, there is undisputed evidence of continuous, business transactions between the corporations. Moreover, close, personal relationships existed between the executives of both companies. Of course, Rockwell contends that familiarity and personal relationships did not influence this business transaction. Accordingly, the trial judge, correctly employing this Court's language in *Zahn v. McMillin,* 179 Pa. 146, 153, 36 Atl. 188, 189-90 (1897), stated in his charge to the jury: " '. . . there are cases where a party must not be silent upon a material fact within his knowledge, although he stands in no relationship of trust and confidence. If a party knows that another is relying upon his judgment and knowledge in contracting with him, although no confidential relation exists—and I will say that none existed in this case—and he does not state material facts within his knowledge, the contract will be avoided, for knowingly to permit another to act as though the action was confidential and yet not state material facts is fraudulent. It is said that a party, in such circumstances, is bound to destroy the confidence reposed in him or to state all the facts that such confidence demands.' " *See, also, Restatement of Torts,* §542 (1938). Thus, the jury could have concluded that Rockwell knowingly abused Scaife's confidence which would further justify Scaife's reliance.

Having established each of the above elements of this cause of action, there is no question of proximately caused damages other than the extent thereof. On balance, we are of the opinion that Scaife introduced clear and satisfactory evidence upon which the jury determined that Scaife was the victim of Rockwell's fraudulent misrepresentation.

Rockwell next argues that Scaife's failure to complain or give notice of any breach for a period of nineteen months after the corporate takeover constitutes a waiver of any recovery.[3] "The affirmance of a contract induced by fraud of the seller does not extinguish the right of the purchaser, and it is not a waiver of the fraud, nor does it bar the right of the purchaser to recover damages for the fraud. [Citation omitted]." *Tilghman v. Dollenberg*, 418 Pa. 604, 610, 213 A. 2d 324, 327 (1965). "Affirmance of the contract is not a waiver of the fraud; nor does it bar the right to recover; it does bar a subsequent rescission." *Miller v. Central Trust & Savings Co.*, 285 Pa. 472, 486, 132 Atl. 579, 584 (1926). *See, also, Emery v. Third Nat'l Bank*, 314 Pa. 544, 171 Atl. 881 (1934). Accordingly, Scaife could affirm the contract and yet maintain this action for fraud.

## No. 43 March Term, 1970

As noted earlier, Scaife's appeal questions the propriety of the new trial ordered by the court en banc limited to the issue of damages because of its conclu-

---

[3] Rockwell's argument is primarily based on Section 2-607(3) of the Uniform Commercial Code, Act of April 6, 1953, P. L. 3, §2-607(3), 12A P.S. §2-607(3). Since the jury's verdict was based on fraudulent misrepresentation and not on any theory involving the Uniform Commercial Code, Section 2-607(3) is inapplicable. However, as hereinafter noted in our textual discussion, a similar, common law concept exists.

sion that the verdict was excessive and Scaife's failure to file the required remittitur. Stated differently, the narrow issue presented is whether the combined award of $1,200,000.28, damages plus interest, is excessive.

In this area of law we begin with the well-recognized principle that the grant or refusal of a new trial because of the excessiveness of the verdict is peculiarly within the discretion of the trial court and will not be reversed unless an abuse of discretion or an error of law has been committed. *See, e.g., Murphy v. Taylor,* 440 Pa. 186, 269 A. 2d 486 (1970) ; *Connolly v. Philadelphia Transp. Co.,* 420 Pa. 280, 216 A. 2d 60 (1966) ; *Guzman v. Bloom,* 413 Pa. 576, 198 A. 2d 499 (1964). Recognizing the difficult task encountered by an appellate court in reviewing the record when a trial court merely assigns conclusory statements—"interests of justice," "shocks the court's conscience" and "substantial justice"—we have attempted to discourage this practice. *See, Gilligan v. Shaw,* 441 Pa. 305, 272 A. 2d 462 (1971) ; *Hilliard v. Anderson,* 440 Pa. 625, 271 A. 2d 227 (1970) ; *Kralik v. Cromwell,* 435 Pa. 613, 258 A. 2d 654 (1969) ; *Beal v. Reading Co.,* 370 Pa. 45, 87 A. 2d 214 (1952) ; *Bellettiere v. Philadelphia,* 367 Pa. 638, 81 A. 2d 857 (1951). In *Hilliard,* the defendant was granted a new trial upon the plaintiff's failure to file a remittitur solely because "the verdict shocked the conscience of the court". Primarly concerned with the "shock the conscience" test, we noted, "[t]he court should state the reasons for this conclusion in order that we may have the opportunity of intelligently determining if an abuse of discretion occurred." 440 Pa. at 628, 271 A. 2d at 229. We now add the "excessive verdict" conclusion to that list of judicial statements requiring additional, supporting reasons. *See, Spangler v. Helm's New York-Pittsburgh Motor Express,* 396 Pa. 482, 153 A. 2d 490 (1959).

Relying on language in past decisions of this Court, Rockwell contends that the *sole* measure of damages in a case of this nature is the difference between the consideration paid for the property and its true market value, as of the date of the sale. *See, Tilghman v. Dollenberg*, 418 Pa. 604, 213 A. 2d 324 (1965); *Neuman v. Corn Exchange Nat. Bank and Trust Co.*, 356 Pa. 442, 51 A. 2d 759 (1947). *See, also, Restatement of Torts* §549a (1938). Accordingly, Rockwell contends that Scaife's proof of its operating cost which included expenses required to produce and market the TSA product inflated the jury's verdict, whereas these figures should not have been presented to the jury.[4] Since Scaife's evidence greatly exceeded the jury's verdict, we believe the trial judge abused his discretion in ordering a new trial after Scaife failed to file the required remittitur. We realize, however, that our conclusion begs the question whether Scaife's expenses and losses are includable in assessing damages.[5]

Initially, we recognize the position taken by many jurisdictions that losses and expenses incurred by the

---

[4] Perhaps this reasoning was accepted by the trial judge; this, however, we cannot determine with certainty since no explanation was given. Nor can we make this determination from the jury's verdict since Scaife's suggestion, prior to the court's charge, that the jury be instructed to itemize its verdict was rejected as untimely by both Rockwell and the trial judge.

[5] Rockwell also contends that the evidence presented by Scaife —prepared summaries of Scaife's voluminous business records—was inadmissible under the rules of evidence. Although the documents were available to Rockwell for several years prior to trial, no attempt was made to inspect these records until trial. Unfortunately, portions of this original mass of material were destroyed. Owing to this partial destruction as well as the sheer volume of these records, Scaife only introduced summaries. We do not believe this was error. *See*, IV Wigmore on Evidence §1230 (3d ed. 1940). Even if there was error, there was no reversible error since Scaife's supporting witnesses were extensively cross-examined on these figures.

defrauded party as a proximate result of the fraud may be recovered. *See*, 37 C.J.S. *Fraud* §141 (1943); *Restatement of Torts* §549b (1938). Moreover, we noted in *Neuman* that, "[w]hile formulated rules relating to the appropriate measure of damage in varying circumstances have to some extent become fixed, they are by no means immutable but bend to the exigencies of the particular case in order that just compensation may be ascertained and awarded". 356 Pa. at 457, 51 A. 2d at 766. Considering the demise of the oil-fired furnace industry, the steps taken by Scaife and the expenses thereby incurred to correct the defective heat exchanger can be fully justified as sound business practice and were proximately caused by Rockwell's misrepresentation. Additionally, Scaife's operating losses may not be equated with the "benefit of the bargain" rule prohibited in *Neuman;* whether all of these losses were proximately caused by Rockwell's fraud is, of course, a question for the jury. In short, to apply the measure of damages formula discussed in *Tilghman* to the sale of a "defective" business would work a grave injustice. It is our opinion that the jury's verdict is fully supported by the evidence and should be reinstated.

Judgment, as modified, is affirmed. The record is remanded with instructions to reinstate the jury's verdict.

Mr. Justice COHEN took no part in the decision of this case.

Mr. Justice POMEROY took no part in the consideration or decision of this case.

---

DISSENTING OPINION BY MR. CHIEF JUSTICE BELL:

The lower Court granted a new trial to Rockwell-Standard Corporation limited to the issue of damages because the verdict was excessive. Our Court reverses and reinstates the jury's verdict because "the jury's

verdict is fully supported by the evidence". Furthermore, this Court for the first time in its history requires the trial Judge (or lower Court) to state his (or its) reasons why he (or it) believes the verdict was excessive.

We all agree with the well-recognized principle that the grant or refusal of a new trial because of the excessiveness of the verdict is peculiarly within the discretion of the trial Court, and will not be reversed unless there is an abuse of discretion or an error of law which controlled the outcome of the case. *Connolly v. Phila. Trans. Co.*, 420 Pa. 280, 216 A. 2d 60; *Guzman v. Bloom*, 413 Pa. 576, 198 A. 2d 499; *Chambers v. Montgomery*, 411 Pa. 339, 192 A. 2d 355.

For many years I have advocated and urged trial Courts to state their reasons for granting or denying a new trial. However, I believe that where a new trial is granted by the trial Judge or lower Court because of an excessive verdict, this should not be mandatory. If a trial Court gives the reasons which induced it to make the Order it did, this would undoubtedly enable an appellate Court to more intelligently analyze and better judge the lower Court's decision. However, in many cases this would likely expose the trial Judge to personal hostility, because oftentimes he would have to state, as the reason for his Order, that he did not believe the plaintiff or the defendant or one or more of the witnesses, or that such-and-such witness seemed to be confused, or that he (or they) was inexperienced or not convincing. While this would, I repeat, greatly aid an appellate Court, we must remember when we come to consider the question of an abuse of discretion that a trial Judge sees and hears the witnesses and, therefore, is in a far better position than an appellate Court to form a fair and just opinion on the point of excessiveness of the verdict.

294

Even more important, the Majority's reversal of the lower Court's Order in this case, "because the jury's verdict was fully supported by the evidence", does not fall within the well-established legal principle which the Majority itself reiterates, i.e., "that the grant or refusal of a new trial . . . is peculiarly within the discretion of the trial court. . . ."

I would therefore affirm the Order of the lower Court which granted a new trial limited solely to the question of damages.