## Baldwin v. Safeguard Investment Co.

*Robert J. Amelio*, for plaintiffs.
*Stanley W. Greenfield* and *Alan Frank*, for defendants.

FINKELHOR, *J.*, April 7, 1977—In the above-captioned complaint in equity, plaintiffs, Jerry M. Baldwin and Joan V. Baldwin, husband and wife (Baldwin), seek to nullify a sheriff's sale of property, located at 1001 Davis Avenue, Pittsburgh, Pa., and to have title to the aforesaid property reinstated in their names. Plaintiffs, Thomas and Judith Salamacha (Salamacha), seek damages for the loss of personal property stored at 1001 Davis Avenue, Pittsburgh, and allegedly destroyed or

damaged by defendant Paul Suto. A counterclaim[1] was filed by Suto against the Salamachas, but was subsequently withdrawn.

The crux of the dispute is a mortgage loan in the amount of $17,100 negotiated between plaintiffs Baldwin and defendant Safeguard Investment Company (Safeguard) in September, 1970. The Baldwins allege that this loan and the disbursement of the loan moneys, including a service charge in the amount of $3,768.48, were fraudulently induced and in violation of the Pennsylvania Debt Pooling Act of 1961,[2] as well as usury laws of the Commonwealth. It is their position not only that the mortgage agreement was void and unenforceable but that the subsequent sheriff's sale and transfer of title to defendant Paul Suto was also grounded on misrepresentation and should be nullified.

It is the position of defendant Safeguard that the service charge represented costs of defendant in securing the loan monies and that past or present debt pooling statutes are not applicable to mortgage agreements. Defendant Suto alleges that he is a purchaser in good faith and that the sheriff's deed passed valid title.

The basic facts, supported by the mortgage agreement and the disclosure and disbursement sheets, are not in dispute. The Baldwins negotiated a mortgage loan in the amount of $17,100 from

1. No evidence was presented on the counterclaim.

2. The present Debt Pooling Act is included in the Crimes Code of December 6, 1972, P.L. 1482, 18 C.P.S.A. §7312, as a misdemeanor of the third degree.

defendant Safeguard dated September 15, 1970, secured by a first lien mortgage on the Davis Avenue property. This sum was paid to the Baldwins by check and was immediately endorsed back to Safeguard for the disbursement of these moneys to creditors of the Baldwins, including a service charge in the amount of $3,768.48 to Safeguard. The disclosure sheet, required by Federal truth in lending regulations, set forth monthly payments at $216.52 for 120 months, with interest at nine percent. In April/March, 1973, the Baldwins defaulted on the monthly payments, judgment was confessed on the bond and the Davis Avenue property was sold at sheriff's sale to defendant Suto, an employe of one of the Pivirotto enterprises, for $568 on or about December 3, 1973.

Thus, the basic issues[3] before the chancellor are, first, whether the mortgage agreement between Baldwin and Safeguard is null and void as a violation of the Pennsylvania Debt Pooling Act of August 8, 1961, P.L. 970, as amended, 18 P.S. §4899, and the usury laws of this Commonwealth; and second, if the contract is found to be invalid, whether the resulting sheriff's sale based upon the confession of judgment under the mortgage agreement must also be stricken.

In view of the allegations of misconduct in the complaint and during trial, it is unfortunate that

---

3. The progress of litigation in this case has been both protracted and stormy. A criminal action was brought against counsel for plaintiffs by the defendants, and it was necessary for the court to supervise the taking of depositions. The untimely death of defendant Pivirotto's original counsel, M. David Turets, further delayed these proceedings.

counsel failed to have transcribed a complete record of the trial of this case held in early 1976.[4] Only plaintiffs have submitted requests for findings of fact.

• • •

## DISCUSSION

### Debt Pooling

The statute prohibiting debt pooling, in effect at the time of the transactions in the present case, was the Act of August 8, 1961, P.L. 970, 18 P.S. §4899, as amended, which defined "debt pooling" to be a misdemeanor, as follows:

"(3) 'Debt pooling' shall mean the making of a contract, express or implied, with a debtor or debtors whereby the debtor agrees to pay a sum of money periodically *or otherwise* to another person for the purpose of having such other person distribute the same among certain specified creditors . . . and whereby such other person shall receive a consideration for any such services rendered, or to be rendered . . ." (Emphasis supplied.)

Any person found guilty of "debt pooling" was subject to a fine of not less than $200 nor more than $500, or to imprisonment for not more than 30 days or both. In addition, the 1961 act specifically stated that "[a]ny contract for debt pooling shall be void and unenforceable."

The current debt pooling statute is part of the

---

4. Only the testimony of the defendant Pivirotto was transcribed. Other findings are based upon the bench notes of the chancellor.

revised Crimes Code of December 6, 1972, P.L. 1482, effective June 6, 1973, 18 C.P.S.A. §7312, defines debt pooling as a misdemeanor of the third degree, and includes substantially the same definitions as the 1961 act, except that the language holding the debt pooling contract to be "void and unenforceable" was not reenacted.

It is defendants' position that, first, debt pooling is limited to the use of the debtor's *own* money for the satisfaction of the preexisting debts, and, second, as a matter of fact, the service charge was to cover costs to defendant in securing the mortgage money.[5]

While debt pooling has been classified as a misdemeanor under the Crimes Code, prior litigation has occurred in civil cases seeking to open judgment under the loan agreement: Davis v. Safeguard Investment Co., 239 Pa. Superior Ct. 300, 361 A. 2d 893 (1976), allocatur denied; Cooperman & Woods, Inc. v. Weikel, 41 D. & C. 2d 374 (1965); Demko v. Pivirotto and Safeguard Investment Co., No. 3844, January Term, 1974 (Allegheny County); Safeguard Investment Co. v. James Cirincione and Elizabeth Jane Cirincione, No. 3589, April Term, 1974 (Allegheny County). In the above-cited cases, a "service charge," similar to the charge included in the agreement of the parties to these proceedings, was found to be within the purview of the Debt Pooling Act.

---

5. Defendant also cites the case of Com. v. Stone, 191 Pa. Superior Ct. 117, 155 A. 2d 453 (1959), wherein a prohibition against "budget planning" was held to be an unconstitutional exercise of the police power. "Budget Planning" involved another section of the Criminal Code of 1939, and is not relevant to the instant proceedings. See also Ferguson v. Skrupa, 372 U.S. 726 (1963).

In Cooperman & Woods, Inc. v. Weikel, supra, cited with approval by the Superior Court in Davis v. Safeguard Investment Co., supra, the late Judge Wessel stated clearly and succinctly:

"After examining the instrument involved, the court is drawn to the conclusion that the agreement is not a mortgage agreement, as the caption would indicate. On the contrary, it specifically authorizes plaintiff to pay the enumerated debts, including an exorbitant fee to themselves. . . . It takes no stretch of the imagination, after examining the agreement, to reach the conclusion that it is patently obvious that the agreement is in violation of The Penal Code, cited supra." 41 D. & C. 2d at 377.

We fail to see the legal distinction, argued by defendant, between a plaintiff who brings "money" to another for payment of creditors and a plaintiff who gives a first mortgage on real property to receive loan money for disbursement to creditors. In both instances the "pool" has been acquired from the assets of the debtor, and a charge is being made for the distribution of the debtor's own assets.

Defendant Pivirotto further contends that the service charge was based on defendants' costs of securing the mortgage money and not as a fee for the consolidation of the Baldwin debts. This defense is essentially a question of fact, and, after a careful examination of the transcript, the chancellor has been unable to find the necessary proof to support this contention. Despite questioning and demands by the plaintiffs' counsel for records of these costs, defendant Pivirotto elected not to place this supporting evidence, within his exclusive control, before the court.

While defendants in a civil case are entitled to use every technical defense available to them under the

Rules of Civil Procedure to withhold the giving of information which might subsequently prove detrimental to them, the behavior of the parties during the trial may be considered by the chancellor in assessing credibility: Nassar v. Pittsburgh Railways Co., 105 Pa. Superior Ct. 352, 161 Atl. 605 (1932); 38 P.L.E. 432, §413.

The Debt Pooling Act is remedial legislation designed to protect the unwary debtor from deception in the market place. Legislation forbidding, regulating, or even taxing those engaged in this business has been passed in a number of states. See Comment, 95 A.L.R. 2d 1354.

In Com. v. Monumental Properties, Inc., 459 Pa. 450, 329 A. 2d 812 (1974), Justice Roberts set forth the scope and purpose of "consumer protection" legislation in this Commonwealth as follows:

"The Legislature sought by the Consumer Protection Law to benefit the public at large by eradicating, among other things, 'unfair or deceptive' business practices. Just as earlier legislation was designed to equalize the position of employer and employee and the position of insurer and insured, this Law attempts to place on more equal terms seller and consumer. These remedial statutes are all predicated on a legislative recognition of the unequal bargaining power of opposing forces in the marketplace. Instantly, the Legislature strove, by making certain modest adjustments, to ensure the fairness of market transactions. No sweeping changes in legal relationships were occasioned by the Consumer Protection Law, since prevention of deception and the exploitation of unfair advantage has always been an object of remedial legislation. . . .

"Since the Consumer Protection Law was in relevant part designed to thwart fraud in the statutory sense, it is to be construed liberally to effect its object of preventing unfair or deceptive practices." 459 Pa. 457, 458, 460, 329 A. 2d 812, 815-817. (Footnotes omitted.)

In addition to the violation of the Pennsylvania Debt Pooling Act—a section of the Crimes Code —we do not believe that the defendant Safeguard has complied with either the Federal Truth in Lending Statute of May 29, 1968, 82 Stat. 146, as amended, 15 U.S.C.A. §1601 et seq., or the Pennsylvania Usury Law of July 24, 1970, P.L. 632, 41 P.S. §3.[6] Without going into the arithmetical calculations, the plaintiffs had the use of approximately $13,000, which would result in a total amortized cost at nine percent for ten years of approximately $20,000. Yet the payments, pursuant to defendants' calculations set forth in the disclosure statement, total $25,982.

The mere fact that dollar amounts are presented to the borrower under the title "Truth in Lending" does not establish the legality of the sums. If the service charge is removed from the various calculations of total debt owed, it is impossible to reconcile the interest rates and the total amount to be repaid with the Pennsylvania Usury law.

On the basis of the above discussion, we find that the agreement between the plaintiffs Baldwin and Safeguard Investment Company is in violation of the Debt Pooling Act of 1961.

---

6. This act has been repealed. See Act of January 30, 1974, P.L. 13, §603.

## Fraud

Plaintiffs, in support of their prayer to nullify the sheriff's sale of their former residence on Davis Avenue, have alleged fraud in two separate areas: (1) the negotiation of the initial loan agreement; and (2) the events surrounding the sheriff's sale itself, and the purchase of the property by the defendant Suto.

Pennsylvania cases have summarized the elements of fraud as follows: (1) a misrepresentation; (2) a fraudulent utterance thereof; (3) an intention by the maker that the recipient will be induced to act; (4) justifiable reliance by the recipient upon the misrepresentation; and (5) damage to the recipient as a proximate result: Scaife Co. v. Rockwell-Standard Corp., 446 Pa. 280, 285 A. 2d 451 (1971); Savitz v. Weinstein, 395 Pa. 173, 149 A. 2d 110 (1959); Ellis v. Harris, 122 Pitts. L.J. 29 (1974). See also Restatement, Torts, §525.

In Scaife Co. v. Rockwell-Standard Corp., supra, the Supreme Court clarified the broad nature of the "misrepresentation" as follows:

"Initially, we note that a fraudulent misrepresentation can take many forms: '"fraud consists in anything calculated to deceive whether by single act or combination, or by suppression of truth, or a suggestion of what is false, whether it be direct falsehood or by innuendo, by speech or silence, word of mouth, or look or gesture. It is any artifice by which a person is deceived to his disadvantage:" [Citation omitted.].' Reichert Estate, 356 Pa. 269, 274, 51 A. 2d 615, 617 (1947)." 446 Pa. 280, 285-286.

While proof of fraud must be by evidence which is clear and convincing, fraud may be established by

the withholding of information as well as the misrepresentation of a given fact.

In the instant proceedings, the disclosure statements given to the Baldwins calculated interest on a debt of $17,100 which did not exist. The illegal service charge was immediately deducted by the defendant Safeguard, but was retained for the calculation of total interest on the loan. While parties are presumed to read documents before signing, the documents prepared by Safeguard in the instant proceeding neither fairly nor adequately disclosed to the Baldwins the facts of the loan arrangement.

Further, it is well established in Pennsylvania law that an agreement which violates provisions of a statute or which cannot be performed without violation of such provisions is illegal and void: Fischer v. Jacobs, 442 Pa. 633, 276 A. 2d 302 (1971); Dippel v. Brunozzi, 365 Pa. 264, 74 A. 2d 112 (1950); Tyler v. Jefferson County-DuBois Area Vocational Technical School, 20 Pa. Commonwealth Ct. 132, 341 A. 2d 235 (1975).

The second alleged area of fraud concerns the proposed assumption of the mortgage on the Davis Avenue property by the plaintiffs Salamacha and is based on the oral testimony of plaintiffs in that portion of the record not transcribed. Considered in conjunction with the other practices utilized by defendants, it is conceivable that the Baldwins and Salamachas were lured into a false sense of security on the outcome of the pending sheriff's sale and believed that defendant Pivirotto would purchase the property on their behalf. However, proof of fraud must be established by clear and convincing evidence and not mere speculation. Plaintiffs Salamacha have not met that burden of proof.

## Validity of the Sheriff's Sale

The next issue to be determined by the chancellor is whether an execution of judgment pursuant to a void contract can pass title, even to a bona fide purchaser, by sheriff's sale.

The mortgage and the loan agreement are inextricably entwined in these proceedings. The payments which the Baldwins were required to make were based upon the loan contract, which included an illegal service charge, in direct contravention of the Debt Pooling Act, as well as questionable interest rates. Any interest in the property which Safeguard acquired against the Baldwins as the result of this agreement was unenforceable as a violation of the stated public policy of the Commonwealth: Com. v. Monumental Properties, Inc., supra.

It is Suto's position that, as a good faith purchaser, he cannot be penalized for the illegality of the Baldwin/Safeguard agreement.

Suto neither testified on his own behalf nor was he called as a witness by the defendant Pivirotto. The alleged knowledge of Suto of the underlying agreement is supported by his status as an employe of other Pivirotto enterprises located at the same address as the Safeguard offices, and the low bid by which the property was acquired. It is difficult to believe that Suto had no knowledge of Safeguard practices and the nature of the loans negotiated by Safeguard.

But more importantly, even as to a good faith purchaser, the passage of title by sheriff's sale is dependent upon the validity of the underlying judgment. As stated by the Supreme Court in Harris v. Harris, 428 Pa. 473, 239 A. 2d 783 (1968):

"If the execution sale was based upon a voidable

judgment, a bona fide purchaser will be protected against actions seeking to recover the purchased property. *On the other hand, where a void judgment is the basis for an execution sale*, one who purchases property *will not acquire* title even if a bona fide purchaser for value." (Emphasis supplied.) 428 Pa. at 474-75.

To reach any other conclusion would, in effect, rob plaintiff of relief from the void agreement and would use the court to enforce a contract declared by the legislature to be "void and unenforceable."

Moreover, accepting arguendo the allegations of Suto of his "good faith" status, and that neither Safeguard nor Pivirotto revealed to him the background of the Baldwin judgment, he retains a cause of action against Safeguard for losses suffered by virtue of the void judgment and subsequent sale.

## Claims of the Salamachas

We further conclude that the plaintiffs Salamacha have not met their burden of proof on damages in these proceedings. The value of the property allegedly stored at Davis Avenue has not been established by clear and convincing evidence.

## The Debt of the Baldwins

Pursuant to the above discussion, it is the conclusion of the chancellor that the September, 1970, mortgage between the Baldwins and Safeguard was void and unenforceable. The confessed judgment and the subsequent sheriff's sale, based upon the illegal agreement, must also be stricken and title therefore reverts to the original owners, the Baldwins.

Accepting the improper and illegal activities of Safeguard, the Baldwins have had the benefit and use of $13,018, less payments made, from 1970 to the present date.

It is an old and familiar equitable axiom that he who seeks equity must do equity—even as to a wrongdoer. Safeguard is entitled to the return of that portion of the loan which was devoted to the benefit of the Baldwins.

## CONCLUSIONS OF LAW

1. A service charge in conjunction with the distribution of the mortgage loan to creditors of mortgagee is a violation of the Pennsylvania Debt Pooling Act of 1961.

2. The debt pooling statute is in the interest of consumer protection and should be liberally construed.

3. A mortgage agreement in violation of the Debt Pooling Act of 1961 is void and unenforceable.

4. Inclusion of a service charge in the computation of interest under a mortgage agreement constitutes misrepresentation to the debtor.

5. A sheriff's sale based on confession of judgment under a void agreement cannot pass valid title, even to a good faith purchaser.

6. A wrongdoer should not be permitted to profit from his own unlawful acts.

## Relief

Where plaintiff enters a prayer for general relief, equity is permitted to frame a decree agreeable to a resolution of the injuries suffered by the parties: Sigal v. Manufacturer's Light & Heat, 450 Pa. 228, 299 A. 2d 646 (1973). The practice involved in these proceedings has not only violated a penal law

of this Commonwealth but has deprived plaintiffs of their home and produced a year of protracted litigation. In the decree nisi filed March 30, 1977, paragraph 5 gave to Safeguard simple interest on that portion of the loan money utilized for the benefit of the Baldwins. A further examination of the record convinces the chancellor that this permits the defendant to continue to profit from a void and unenforceable agreement. [Editor's note: See paragraph 9 of the Final Decree.]

• • •

## OPINION ON EXCEPTIONS

FINKELHOR, *J.*, August 8, 1977—The above matter is before the court en banc on the exceptions of all parties to the chancellor's adjudication and decree nisi. Plaintiffs object to the reformation of the loan agreement to provide for partial repayment to Safeguard, and the denial of recovery to the Salamachas.[7] In addition, plaintiffs have pending before the chancellor a request to take possession of the disputed property located at 1001 Davis Avenue, Pittsburgh, Pa. Defendants Safeguard and Pivirotto except to the chancellor's adjudication on the violation of the Debt Pooling Act of August 8, 1961, P.L. 970, as amended, 18 P.S. §4899. Defendant Suto specifically excepts to the finding of the chancellor that the sheriff's sale failed to pass valid title.

The proceedings in this equity action were drawn out over a period of approximately two years with substantial bitterness between both parties and counsel. Efforts of the chancellor at the outset of

---

7. Plaintiffs also note that, pursuant to the record, the counterclaim of Suto was not withdrawn.

the proceedings to effect some temporary agreement as to the property located at 1001 Davis Avenue were not successful, and hostility was such that the court was required to supervise the discovery proceedings. It now appears at this juncture that the property is empty, taxes have not been paid, and a second sheriff's sale is possibly pending. Therefore, we will attempt to resolve the exceptions filed as expeditiously as possible, even though only a portion of the record has been transcribed.

The adjudication filed April 7, 1977, considered in depth many of the issues raised again on exceptions[8] and, to this extent, the court will not repeat previous findings.

Plaintiffs Jerry M. Baldwin and Joan V. Baldwin, husband and wife, sought to nullify a sheriff's sale of property, located at 1001 Davis Avenue, Pittsburgh, Pa., and to have title to the property reinstated in their names. The property was sold as the result of a mortgage loan in the amount of $17,100, negotiated between the plaintiffs Baldwin and defendants Safeguard Investment Company (Safeguard) and Anthony Pivirotto[9] in September, 1970. The chancellor found that this loan agreement and the disbursement of the loan moneys, including a service charge in the amount of $3,768.48, was fraudulently induced and in violation of the Debt Pooling Act of 1961, supra. This

8. Other general exceptions were filed by counsel but were a reiteration of motions made during the trial of the proceedings. However, all of these matters have been carefully considered by the court.

9. Pivirotto is president, secretary and treasurer of Safeguard and owns 100 percent of the stock. However, the loan agreement was made with Safeguard.

loan was secured by a mortgage on the Davis Avenue property and a bond of the Baldwins.

Upon default by the Baldwins in the payment of the loan, judgment was confessed against the Baldwins on the mortgage bond and the property was sold by sheriff's sale to the defendant Paul Suto. (Ex. No. 246, January Term, 1974.) From the time of default, the Baldwins, the plaintiffs Salamacha (sister and brother-in-law of the Baldwins), and Safeguard were engaged in negotiations for the take-over of the loan and mortgage by the Salamachas. Pursuant to instructions of Safeguard, neither the Baldwins nor the Salamachas appeared at the sheriff's sale, and the property was sold to Suto, a business associate of defendant Pivirotto, the sole stockholder of Safeguard.

The claim of the Salamachas against Suto was for money damages allegedly flowing from conversion of personal property belonging to the Salamachas and stored at the Davis Avenue property. The counterclaim filed by Suto sought damages resulting from the loss of a sale of the Davis Avenue premises to a good faith purchaser.

The court will consider the exceptions of the parties seriatim.

### The Agreement Between the Baldwins and Safeguard

The loan agreement between Baldwin and Safeguard provided for a mortgage of $17,100. Of this amount, $3,768.46 was immediately returned to Safeguard. The debts of the Baldwins to Western Pennsylvania National Bank, Associates Consumer Discount, and others were paid with the remainder of the moneys, less costs. The Baldwins

executed a first mortgage to Safeguard to secure the loan, and a mortgage bond was also provided. The amount of the loan was set at $17,100, with payment of $216.62 per month, and included interest calculated at nine percent per annum, but resulting in an annual percentage rate of 15.25 percent. (Defendants' Exhibit 2; Disclosure Notice.)

As stated by the chancellor in her adjudication: " . . . the disclosure statements given to the Baldwins calculated interest on a debt of $17,100, which did not exist. The illegal service charge was immediately deducted by the defendant Safeguard, but was retained for the calculation of total interest on the loan. While parties are presumed to read documents before signing, the documents prepared by Safeguard in the instant proceeding neither fairly or adequately disclosed to the Baldwins the facts of the loan arrangement." 10 D. & C. 3d, at 515.

The chancellor further found that the loan agreement of the Baldwins and Safeguard provided a service charge in direct contravention to the Debt Pooling Act, supra: Davis v. Safeguard, 239 Pa. Superior Ct. 300, 361 A. 2d 893 (1976), allocatur denied; Demko v. Safeguard, 3844 January Term, 1974, 641 April Term, 1976 of the Superior Court, allocatur denied June 27, 1977.

Based upon the above cases interpreting contracts prepared by the same defendant (Safeguard) with similar service charges, it is well established that these practices are in direct violation of the Debt Pooling Act of 1961. In Demko and Davis, the excess charge was stricken. However, the chancellor also found in the instant proceedings not only a violation of the Debt Pooling Act, but fraud on the part of Safeguard in failing to disclose to the Baldwins the true terms of the loan agreement.

Having found that these proceedings were void ab initio, the question is what relief can be granted to the parties.

As noted in the initial adjudication, the Debt Pooling Act of 1961, a criminal statute, was remedial legislation to protect the unwary debtor from exploitation in the market place. Assuming arguendo that the Baldwins and others were not good credit risks, this does not open the door to illegal charges. Debtors, as well as creditors, are entitled to the protection of the law: Fuentes v. Shevin, 407 U.S. 67 (1972).

Contrary to the arguments of the defendant Suto, plaintiffs did not bring an action at law, but instead sought the return of the foreclosed property. Conceivably, the matter might have been adjudicated in a suit for money damages, but there is no rule of law that requires the plaintiff to pursue his cause of action in a manner most convenient to the defendant.[10]

Therefore, we find that, as the loan agreement was both in violation of the Debt Pooling Act of 1961, supra, and tainted with fraud in its inception, all documents stemming from the agreement, including the mortgage on the Davis Avenue property, the accompanying bond, and the confessed judgment under the bond, are also void.[11]

---

10. It is defendants' further position that the appropriate remedy would be by petition to open judgment. Based upon the facts of this case, plaintiffs failed to act in reliance upon defendant Safeguard's negotiations with the Salamachas.

11. An examination of Execution Docket no. 246 January Term, 1974, sets forth that execution was based on a confessed judgment under the mortgage bond for a debt in the amount of $16,043.12.

An agreement which violates provisions of a statute or which cannot be performed without violation of such provisions is illegal and void: Dippel v. Brunozzi, 365 Pa. 264, 74 A. 2d 112 (1950); R. & R. Trucking Co. v. Lewis Steel Products Corp., 424 Pa. 34, 225 A. 2d 687 (1967).

As stated by the late Justice Musmanno in R & R Trucking Co. v. Lewis Steel Products Corp., supra:

"'As was said by Mr. Justice Agnew, in answer to an argument similar to the above, in the case of Morris Coal Co. v. The Barclay Coal Co., 18 P.F. Smith 188, "When a bill, note or bond is but an instrument to execute an illegal contract, it is tainted by the illegality and cannot be recovered. The illegal consideration enters directly into the instrument, and is followed up because the law will not permit itself to be violated by mere indirection."

"'Were the doctrine otherwise, every illegal contra t, however much opposed it might be to public morality or even to common decency, might be readily and securely covered from judicial inquiry by the mere interposition of a note or bond. Were it only a question between the parties we might leave them to the consequences of their own contracts, but it is not so; it extends further and involves the public welfare, and we certainly know that the best way to suppress any public vice is to make it unprofitable.'" 424 Pa. 38.

While the above opinion concerned an agreement in violation of P.U.C. regulations, the language is even more applicable to an agreement in violation of the Crimes Code of this Commonwealth. Thus, both the mortgage and the mortgage bond are tainted with the illegality of the loan agreement.

## The Position of Suto

It is the position of the defendant Suto that even if the mortgage agreement between Safeguard and Baldwin was tinged with fraud and illegality, the sheriff's sale passed valid title to Suto, a "good faith" purchaser, and this title cannot be invalidated by the court. We are aware that this is the rule of law in most of the reported cases: Restatement, Judgments, §115(2). However, the "good faith" status of defendant Suto is not established by the record in these proceedings. Suto is not a third party removed from the transaction. He was employed by one of the Pivirotto enterprises and shared offices with the Safeguard Company. Further, this is not the first time that the loan agreements of Safeguard have come before the courts, and it is difficult to believe that Suto was without knowledge of the basic practices of the Safeguard Company.

It was the intent of the chancellor, exercising the powers of equity, to place the parties in the same situation as they were in prior to the start of these unfortunate proceedings, and it is our belief that the plaintiffs, having established both a void agreement and a void judgment, should not be deprived of the return of their property.

Further, both plaintiffs Baldwin and Salamacha were assured by Pivirotto, on behalf of Safeguard, that he would represent their interest at the sale (Findings 29 and 30), and that their presence was not required to transfer the property to plaintiffs Salamacha.

Thus, while the agreement in the instant proceedings is voided for a different reason than that in Harris v. Harris, 428 Pa. 473, 239 A. 2d 783 (1968), the Harris case establishes precedent for the rescis-

sion of a sheriff's sale where the underlying proceedings are tainted with illegality.

Moreover, defendant Suto is not without remedy. While Suto did not file a claim for damages against the other defendants in the instant case, he retains a cause of action for both out-of-pocket expenditures and loss of profit against Pivirotto and Safeguard. The final decree will be amended to recognize these rights.

Justice Cohen stated in Harris, supra, as follows:

"If the execution sale was based upon a voidable judgment, a bona fide purchaser will be protected against actions seeking to recover the purchased property. On the other hand, where a void judgment is the basis for an execution sale, one who purchases property will not acquire title even if a bona fide purchaser for value. See 33 C.J.S., Execution §§6, 230, 299a (1942); Restatement, Judgments §115, comment j (1942) and Pennsylvania Annotations; 3 and 4 American Law of Property §§13.1, 18.60 (1952)." 428 Pa. 474, 475.

The record establishes continuing negotiations on the part of Safeguard with both plaintiffs, including promises that lulled plaintiffs into a false sense of security, and resulted in the absence of plaintiffs at the sheriff's sale.

While the crime of forgery was involved in Harris, debt pooling has also been found to be a criminal act. Again, as stated by Justice Musmanno in R & R Trucking Co., supra, "the best way to suppress any public vice is to make it unprofitable." 424 Pa. 34, 38.

### The Repayment of the Loan

We have been unable to find any case to support plaintiffs' proposition that they are entitled to retain all moneys loaned by Safeguard and also re-

ceive the property in question. Equity attempts to place the parties back in the position that they were in prior to the improper proceedings. Plaintiffs do not question that the moneys from the loan were used to pay off their debts. To this extent, plaintiffs have benefited from the transaction and, to this extent, the chancellor has directed the return of the moneys (with certain protections, as set forth, infra) to Safeguard. The chancellor is not enforcing the illegal agreement and has stricken any and all profit to Safeguard from the transaction. . . .

## Motion to Recuse

Counsel for both Suto and Safeguard filed a motion to recuse in these proceedings based upon the participation of the chancellor in the unsuccessful negotiations for settlement. As efforts are routinely made by all members of this court to conciliate prior to trial, we do not think that this issue warrants discussion. Other than matters which are of public record in reported judicial decisions, the chancellor had no knowledge or relationships with either plaintiffs or defendants.

## Modification of the Decree Nisi

After a careful review of the file in these proceedings and that portion of the record printed by the parties, and the various briefs filed by counsel, there remain matters unresolved by the preliminary decree. Both plaintiffs Baldwin and defendant Suto allege out-of-pocket expenses, possible unpaid real estate taxes and damage to the property resulting from its unoccupied state during the period of litigation.[12]

---

12. All of these matters were brought forth in letters and briefs and were not made part of the hearing record.

Based upon the findings of fact, as set forth in the adjudication of the chancellor, these losses must be attributable to the initial loan agreement, i.e., the poisoned fruit of the poisoned tree.

Under the chancellor's initial decree, after accounting of the amounts due and owing from the Baldwins to Safeguard, and the deduction of the illegal service charge and other costs, payments were to be made to Safeguard of the moneys actually received by the Baldwins or the Baldwin creditors. To avoid further controversy in these proceedings, the final decree shall provide that these moneys shall be paid by the Baldwins to the prothonotary of this court to be used to defray the various damages, other than normal maintenance that may have occurred to the property, and to include out-of-pocket expenditures for repairs of the defendant Suto and unpaid taxes. The remaining balance at the end of the two-year period will be distributed to the defendant Safeguard.

Plaintiffs are correct that the chancellor denied the motion of Suto to withdraw the counterclaim. Since said counterclaim was not pursued in the testimony, said claim will be dismissed with prejudice.

Except as noted in this opinion, the findings of fact and adjudication of April 7, 1977, are affirmed.

Based upon the above discussion, the final decree of the court is attached hereto.

## FINAL DECREE

And now, August 8, 1977, after full consideration of the briefs and arguments of counsel, filed as exceptions to the decree nisi, it is hereby ordered, adjudged, and decreed as follows:

(1) The mortgage loan agreement between Jerry M. Baldwin and Joan V. Baldwin, husband and wife, and Safeguard Investment Company (or Safeguard Company, or Anthony Pivirotto) in the amount of $17,100 dated September 15, 1970, is found to be void and unenforceable as a violation of the Pennsylvania Debt Pooling Act of 1961.

(2) The confession of judgment dated November 7, 1973, at D.S.B. 954, January Term, 1974, and Ex. no. 246, January Term, 1974, and the sheriff's sale held December 3, 1973, on said judgment and the deed from the sheriff to Paul Suto, recorded March 7, 1974, in Deed Book Volume 4778, page 107, all shall be stricken as void and the prothonotary of this court is directed to so note upon the record of those proceedings at Ex. no. 246, January Term, 1974.

(3) Upon praecipe by plaintiffs Baldwin, the recorder of deeds is directed to strike the record of the sheriff's deed set forth in Deed Book Volume 4778, page 107.

(4) Upon praecipe by plaintiffs Baldwin, the Sheriff of Allegheny County is directed to tender a sheriff's deed to Jerry M. Baldwin and Joan V. Baldwin.

(5) Title and ownership of the property located at 1001 Davis Avenue, Pittsburgh, Pa. shall be reinstated in the names of plaintiffs Jerry M. Baldwin and Joan V. Baldwin upon the effective date of this decree, and upon praecipe of plaintiffs, shall be so recorded in the office of the recorder of deeds.

(6) Defendant Paul Suto is directed to give to plaintiffs Jerry M. Baldwin and Joan V. Baldwin immediate possession of the property located at 1001 Davis Avenue, Pittsburgh, Pa.

(7) Within 30 days of the final decree, Safeguard Investment Company shall provide to plaintiffs Baldwin and file with the prothonotary of this court an accounting of the monthly payments made by the Baldwins on the mortgage loan agreement of September 15, 1970, and all such monthly payments shall be credited to the principal of the loan, without allowance of interest. The stated principal of the loan shall be reduced to $13,019.

(8) Safeguard Investment Company shall further provide plaintiffs with a statement of taxes paid on the subject premises and, in the event that taxes have not been paid on said premises, said taxes due and owing may be deducted from the principal, as set forth in paragraph 7 above.

(9) Plaintiffs Baldwin are granted 24 months from the date of the final decree for the repayment of the remaining moneys received from Safeguard Investment Company, as set forth in paragraph 7 above. These payments shall be made by equal monthly payments, beginning 10 days after receipt of the accounting, and shall include simple interest for the 24-month period, calculated at six percent per annum, or by such other method of repayment as may be agreed to by the parties and approved by the court, but the amount of said monthly payments shall be furnished to the court.

(10) The payments set forth in paragraph 9 shall be paid to the prothonotary of this court and the first payment shall be due and owing ten days after defendant Safeguard has complied with paragraph 7, and thereafter on or before the tenth day of each month.

(11) The prothonotary is directed to place these moneys in an interest-bearing account, and upon petition, out-of-pocket expenditures by the defend-

ant Suto or by the plaintiffs Baldwin may be recovered, and at the expiration of the 24-month period, defendant Safeguard may petition for the remaining balance of the funds.

(12) The claim of damages of plaintiffs Salamacha are dismissed.

(13) This decree is without prejudice to the defendant Suto to pursue remedies for damages against defendant Safeguard Investment Company.

(14) The counterclaim of defendant Suto against plaintiffs Salamacha is dismissed.

(15) After full consideration, all other exceptions filed by the parties are dismissed.

[Editor's note: Decree affirmed, per curiam, by the Superior Court, ___ Pa. Superior Ct. ___, 393 A. 2d 1271 (1978). Allocatur denied December, 1979, and certificate denied by U.S. Supreme Court, May 4, 1979.]