J-E04002-13

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| MARGO POLETT AND DANIEL POLETT, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellees | |
| v. | |
| PUBLIC COMMUNICATIONS, INC., ZIMMER, INC., ZIMMER USA, INC., AND ZIMMER HOLDINGS, INC., | |
| Appellants | No. 1865 EDA 2011 |

Appeal from the Judgment Entered June 10, 2011
In the Court of Common Pleas of Philadelphia County
Civil Division at No(s): August Term, 2008 No. 02637

BEFORE:  BENDER, P.J., FORD ELLIOTT, P.J.E., BOWES, GANTMAN,
         DONOHUE, SHOGAN, LAZARUS, OLSON, AND WECHT, JJ.

CONCURRING MEMORANDUM BY BOWES, J.:         **FILED JUNE 06, 2016**

I concur with the learned majority, but write separately to add my observations about remittitur in general and in this case specifically.

In ***Novak v. Supermarkets General Corp.***, No. 5188, 1994 WL 1251183, at *1 (Pa.Com.Pl. Nov. 18, 1994), former Superior Court Judge Richard Klein, then Judge in the Philadelphia Court of Common Pleas, opined that "[a]ssessing damages for pain and suffering is a most difficult proposition."  He lamented that such an arduous task was left to jurors "with almost no guidance on how to translate units of pain into dollars and cents." ***Id***.  Judge Klein found it of the utmost importance for the trial court, with its

years of experience and familiarity with past verdicts and settlement values, to ensure that justice be rendered through verdicts within the bounds of reasonableness.

In **Novak**, Judge Klein utilized the six factors set forth in **Kemp v. Philadelphia Transportation Co.**, 361 A.2d 362 (Pa.Super. 1976) ("**Kemp** factors"), in evaluating whether the verdict was excessive and should be remitted: (1) the severity of the injury; (2) whether plaintiff's injury is manifested by objective physical evidence or whether it is only revealed by the subjective testimony of the plaintiff; (3) whether the injury will affect the plaintiff permanently; (4) whether the plaintiff can continue with his or her employment; (5) the size of the plaintiff's out-of-pocket expenses; and (6) the amount plaintiff demanded in the original complaint. **Id**. at 362-64.

Employing those factors, Judge Klein determined that the **Novak** verdict exceeded the bounds of reasonableness. While struggling to arrive at a more reasonable numerical value for the verdict, even given the guidance of the **Kemp** factors, Judge Klein conceded, "[a]ll that I can do is give my best judgment as an experienced civil trial judge." **Novak**, WL 1251183, at *3. However, Judge Klein believed there had to be a better way to fix damages for non-economic loss. Indeed, in **Novak** he opined, "[t]here is no question in my mind that we will not be fixing damages for intangibles this way in 25 years . . . ." **Id**.

Judge Klein recognized the inherent difficulty arising from the subjective determinations involved in placing a dollar value on another's damages, especially non-economic losses. Our Supreme Court expressed similar frustration in **Haines v. Raven Arms**, 640 A.2d 367, 369 (Pa. 1994), observing that, "it is asking a great deal of a lay jury to fix a figure [in a case like this] with no experience and precious little guidance." While the Supreme Court endorsed the trial judge's "long background from which to draw when determining what is excessive and what is not excessive," **id.** at 370, it called for such experience to be supplemented with consistent and predictable review at the appellate level.

We are charged on appeal with deciding "whether the award of damages 'falls within the uncertain limits of fair and reasonable compensation or whether the verdict so shocks the sense of justice as to suggest the jury was influenced by partiality, prejudice, mistake, or corruption.'" **Id**. at 369. As the **Haines** Court recognized, it is a daunting task when the trial court "merely assigns conclusory statements – 'interests of justice,' 'shocks the court's conscience,' and 'substantial justice.'" **Id**. (quoting **Scaife Co. v. Rockwell-Standard Corp.**, 285 A.2d 451, 456-57 (Pa. 1971)). The Court sought to discourage such practice in favor of trial courts providing specific reasons in support of their conclusions regarding remittitur "in order that we may have the opportunity of intelligently determining if an abuse of discretion occurred." **Id**.

Twenty-two years after *Novak* and *Haines*, I worry that we have yet to provide sufficient guidance for trial courts facing remittitur decisions. Sometimes we cite the *Kemp* factors; other times we consider those factors without actually acknowledging their origin. *See e.g. Dubose v. Quinlan*, 125 A.3d 1231, 1244-45 (Pa.Super. 2015) (determining that $1,000,000 Survival Act jury verdict was not excessive without citing *Kemp* factors, but considering the severity of the injury and the permanent nature of plaintiff's condition); *Gurley v. Janssen Pharms., Inc.*, 113 A.3d 283, 295 (Pa.Super. 2015) (citing *Kemp* factors, and deferring to trial court's findings which considered evidence of the severity and permanent nature of the injuries); *Graham v. Campo*, 990 A.2d 9 (Pa.Super. 2010) (utilizing evidence of lost wages, severity of injuries, and post-injury employment without citing *Kemp* factors); *Whitaker v. Frankford Hosp. of City of Philadelphia*, 984 A.2d 512 (Pa.Super. 2009) (utilizing evidence of the severity of injuries and the permanent nature of the injury without citing *Kemp* factors); *Paliometros v. Loyola*, 932 A.2d 128 (Pa.Super. 2007) (citing *Kemp* factors and analyzing verdict based on the four factors it found relevant); *Potochnick v. Perry*, 861 A.2d 277 (Pa.Super. 2004) (utilizing evidence that plaintiff was permanently unemployable and medical testimony relevant to severity of injuries without citing *Kemp* factors).

The *Kemp* factors provide an adequate starting point for a trial court facing a remittitur determination. The severity and permanency of the

injuries, whether they are objectively manifested, and whether a plaintiff can resume his or her employment, are very helpful in assessing the reasonableness of a verdict.[1] The majority also references the factors set forth in Pa.R.C.P. 223.3, which we instruct the jury to consider in arriving at an award for non-economic loss. It stops short, however, of suggesting that trial courts weigh these same factors in making their remittitur determinations. The factors include: the age of the plaintiff;[2] the extent to which the injuries affect the ability of the plaintiff to perform the basic activities of daily living and other activities in which the plaintiff previously engaged; the duration and nature of medical treatment; the duration and extent of the physical pain and mental anguish that the plaintiff has experienced in the past and will experience in the future; the health and physical condition of the plaintiff prior to the injuries; and in the case of

---

[1] The amount of damages requested in a trespass complaint for personal injuries usually has little bearing on the value of the case, but merely determines whether the case is assigned to arbitration or the general docket. *See* Pa.R.C.P. 1021(c). However, in *Ferrer v. Trs. of the Univ. of Pa*., 825 A.2d 591, 611-612 (Pa. 2002), a contract case, our Supreme Court remitted a damage award of $5,000,000 to $2,900,000, which was the maximum value of the loss testified to by the plaintiff's expert.

[2] Commonly, a plaintiff's age is used in calculating life-expectancy where the jury finds the plaintiff's injuries will continue into the future. *See* Pa.S.S.J.I. (Civ) 7.240.

disfigurement, the nature of the disfigurement and the consequences for the plaintiff. Pa.S.S.J.I. (Civ.) 7.130 (specifically tracking Pa.R.C.P. 223.3).[3]

I am in favor of trial courts starting with the **Kemp** factors, and also utilizing the Rule 223.3 parameters, to evaluate the reasonableness of a verdict.[4] The fact that the trial court employed this dual approach facilitated our review. However, identifying relevant factors is only the first step. How a trial court should analyze the factors is just as important. I believe this is where the trial court went awry in this case, due in large part to our failure to provide specific guidance in that regard.

In the instant case, the trial court purported to apply the **Kemp** factors. It described Mrs. Polett's injuries, discussed her ailments, her deteriorating condition, and the numerous surgical interventions required to manage her symptoms. Trial Court Memorandum, 6/10/11, at 52-55. It noted that her functional limitations were permanent as she was not

---

[3] Some trial courts have intuitively looked to these additional factors in making their remittitur decisions. **See e.g.**, **Hyrcza v. West Penn Allegheny Health Sys.**, 978 A.2d 961 (Pa.Super. 2009) (where trial court looked to the Pa.R.C.P. 223.3 factors for non-economic damages in assessing whether the verdict shocked the conscience); **see also Vogelsberger v. Magee-Womens Hosp. of UPMC Health Sys.**, 903 A.2d 540, 557 (Pa.Super. 2006) (affirming trial court's grant of remittitur that was based on consideration of Pa.R.C.P. 223.3 factors).

[4] Of course, there will always be some measure of subjectivity in determining the value of another's pain and suffering, or embarrassment and humiliation, but that is no bar to developing a predictable and consistent framework from which we can appraise those circumstances.

expected ever to be able to fully straighten her leg. *Id*. at 54. Yet, with regard to whether she was able to return to gainful employment, the court simply observed that Mrs. Polett did not work outside the home in 2006, seemingly rejecting the relevancy of that factor. *Id*. at 55. It similarly dismissed the absence of out-of–pocket expenses such as medical bills as insignificant to its analysis.

Rather than dismiss *Kemp* factors that are not supported by the evidence as irrelevant, I believe trial courts should view the absence of such evidence as significant in assessing the reasonableness of the verdict. For instance, any analysis of whether the verdict was excessive herein should include an acknowledgement that Mrs. Polett is not entitled to compensation for the loss of her ability to work outside the home or medical expenses, very important elements of compensatory damages.

While the trial court herein did not expressly reference Pa.R.C.P. 223.3 elements of non-economic damages, it did consider several of those elements. For instance, the court noted that the jury was shown photographs of Mrs. Polett's permanent scars, evidence probative of her disfigurement damages.[5] *Id*. at 54. It summarized what the jury heard

---

[5] Mrs. Polett had two previous left knee replacement surgeries as well as a total right knee replacement surgery, which presumably left scars, prior to the tortious conduct which is the subject of this case. N.T. Trial Vol. I, 11/15/10, at 114, 116; Vol. II, 11/15/10 at 60.

from the Plaintiff about her pain and the medical experts' account of her surgical ordeals and permanent functional limitations. In addition, the trial court noted that the jury viewed videos of Mrs. Polett prior to her injuries. The court drew extensively from the record to demonstrate Mrs. Polett's inability to resume her normal daily activities such as driving, and the need for assistance in dressing herself and getting into bed. She no longer could enjoy activities such as skiing, swimming, bike riding, or shopping with her daughter, and due to her condition, had to forego hosting an annual event for young people at their shore home.

However, in its weighing of these factors, the trial court did not consider the activities that Mrs. Polett remained capable of performing. Following her injury, she traveled domestically to the Poconos, New York City, Chicago, Utah, and Arizona. N.T. Trial Vol. I, 11/17/10, at 130, 135. She also traveled internationally to Sweden, Finland, Russia, Vietnam, and the Caribbean. N.T. Trial Vol. II, 11/17/10 at 49; N.T. Trial Vol. I, 11/17/10, at 105. Mrs. Polett maintained her social and civic obligations, *i.e.*, she attended meetings of the Board of Rosemont College, served as the co-chairperson of the fund-raising drive at St. Ignatius Nursing Home, and continued to actively serve on the committee for the Cardinal Christmas for Children program. N.T. Trial Vol. I, 11/17/10,at 113, 108.

The trial court also ignored her pre-existing condition. There was uncontroverted evidence that Mrs. Polett suffered from rheumatoid arthritis

and had undergone numerous surgeries and ongoing medical treatment related to that chronic disease. Furthermore, it did not assess the impact of her age on her future damages. Mrs. Polett was 67 years old at the time of her injury and 71 years of age at the time of trial. Evidence was presented showing her life expectancy in 2010 was 86.1 years. N.T. Trial Vol. I, 11/18/10, at 84. The trial court correctly informed the jury that Mrs. Polett's underlying rheumatoid arthritis was not to be considered in determining Appellant's liability, **see id**. at 79, but that it was relevant to the award of non-economic damages. **Id**. at 83. Mrs. Polett's underlying condition and life expectancy weigh heavily against upholding this extremely large verdict.

Instead of performing an even-handed assessment of the uncontroverted damages evidence, the trial court recapped only the evidence that would tend to support the jury's award of compensatory damages, and did so in a light most favorable to Mrs. Polett. In essence, the trial court engaged in a sufficiency analysis, and concluded that no remittitur was due as "the jury's decision was supported by all of the evidence." Trial Court Memorandum, 6/10/11, at 55-56. However, the issue in remittitur is not merely whether the evidence is sufficient to support the verdict, but whether the award is reasonable based on the proven damages. A

reasonableness determination requires an even-handed and balanced assessment of the evidence accepted by the jury.[6]

In justifying its denial of remittitur, the trial court relies upon *McManamon v. Washko*, 906 A.2d 1259 (Pa.Super. 2006) (upholding a $20 million verdict), and its discussion of non-economic damages. However, in that case, a vehicle struck the plaintiff, who was working as a flag person for a construction company in a posted work zone. *Id*. at 1264. She sustained a serious brain injury resulting in permanent cognitive deficits as well as physical injuries, including multiple broken bones. *Id*. At the time of her injury, the plaintiff was a single, forty-one-year-old mother of three. *Id*. The jury verdict included more than $7.7 million for past and future medical

---

[6] In our recent decision in *Dubose v. Quinlan*, 125 A.3d 1231 (Pa.Super. 2015), the trial court correctly viewed the **controverted** evidence of pain and suffering in the light most favorable to the plaintiff as the verdict winner in making its remittitur determination. The appellants argued that the $1 million verdict in a survival action was "shockingly excessive in light of the decedent's pre-existing injuries and lack of brain function." *Id*. at 1244. They also contended that the decedent was in a vegetative state and suggested that she was incapable of feeling pain. The trial court was quick to point out that, while the decedent had pre-existing injuries when she arrived at the nursing home, she did not have the festering bedsores that eventually caused her death. Furthermore, the trial court cited the plaintiff's testimony that the decedent was able to non-verbally interact with him by moving her hands and watching television, and characterized her mental awareness as an issue of credibility that the jury had decided in the plaintiff's favor. It also rejected the appellants' premise that the decedent was physiologically incapable of feeling pain, noting that she was placed on a pain management program.

expenses and $400,000 for past and future lost earnings; pain, suffering, and disfigurement comprised $11 million of the total verdict.

The injuries in **McManamon** were catastrophic. A young healthy plaintiff was rendered unable to work to support her children and required assistance to perform the basic activities of daily living. **Id**. The severity of the injuries, the age of the victim, the need for daily assistance, the wage loss and medical bills culminated in a significant award that "fairly represent[ed] the totality of her injuries." **Id**. at 1288.

My colleagues conclude, and I agree, that the $26.6 million jury award herein "was excessive – if not punitive - and clearly beyond what the evidence warrants." Majority Memorandum at 6. I submit that, in the absence of catastrophic injuries, cognitive deficits, amputation, significant deformities, or death, this $26.6 million compensatory damage award, including the $1 million award for loss of consortium, is startling and excessive. The Product Liability Advisory Council ("PLAC"), in its *amicus curiae* brief, notes that in 2010, Mrs. Polett's jury verdict represented the single largest compensatory damages award in Philadelphia, the eighth largest total verdict awarded in Pennsylvania, and the seventy-fifth largest total verdict awarded in the country. Brief of *amicus curiae* Product Liability

Advisory Council, at 2.[7]  Her verdict far exceeds other verdicts in Philadelphia County in 2010, despite the fact that her injuries were less severe, she had pre-existing medical conditions, no economic damages, and was older than the other plaintiffs at the time of her injury.[8]

In conclusion, I encourage trial courts to apply both the **Kemp** factors and the Rule 223.3 elements of non-economic damages in their remittitur determinations, and to set forth their analysis of these factors to assist us in our review.  Moreover, in applying those factors, the trial court should perform a balanced assessment of the proven damages, giving due weight

---

[7] **See e.g.**, **Rice v. 2701 Red Lion Associates**, No. 2328, 2007 WL 3052308 (Pa.Com.Pl. July 5, 2007), reversed on other grounds, 981 A.2d 331 [767 EDA 2007] (Pa.Super. 2009) (unpublished memorandum), verdict aff'd, 2010 WL 4814409 (Pa.Com.Pl. 2010), where the plaintiff was awarded $12.4 million for injuries sustained while operating a forklift.  In refusing to grant remittitur, the court noted the plaintiff introduced evidence of $6.4 million in economic damages, was thirty-seven years old at the time of his injury, was rendered partially paralyzed, would require permanent personal assistance, and was totally unemployable.  **See also Van Tassel v. Alfa Laval Inc.**, No. 001221-2008, 2010 WL 5626857 (Pa.Com.Pl. March 23, 2010) (awarding $12 million to the estate of an individual who died of mesothelioma at 64 years of age after suffering from lung collapse, pleural effusion, and rendered oxygen-tank dependent); **Schroeder v. Anchor Darling Valve Co.**, No. 00675, 2010 WL 5856065 *3 (Pa.Com.Pl. Sept. 17, 2010) (awarding $10 million to the estate of an individual who died of mesothelioma at 56 years of age, and had suffered the "excruciating and debilitating effects of the illness for at least four years before he died").

[8] That these damages were decreased by 30% due to Mrs. Polett's comparative negligence, and that the jury may have increased her award in expectation of this reduction, does not alter my conclusion that this verdict, and Mr. Polett's loss of consortium award, exceeded the bounds of reasonableness, and should be remitted.

and consideration to the uncontradicted evidence that tends to mitigate damages. This approach permits the trial court, and in turn, this Court, to ascertain whether the amount of the verdict bears a rational relationship to the loss suffered.

I join fully in the majority's decision to remand for remittitur in this matter.

Gantman, J. joins this Concurring Memorandum.